# NEDER *v.* UNITED STATES

No. 97–1985.   Argued February 23, 1999—Decided June 10, 1999

REHNQUIST, C. J., delivered the opinion for a unanimous Court with respect to Parts I and III, and the opinion of the Court with respect to Parts II and IV, in which O'CONNOR, KENNEDY, THOMAS, and BREYER, JJ., joined. STEVENS, J., filed an opinion concurring in part and concurring in

4

■

the judgment, *post*, p. 25. SCALIA, J., filed an opinion concurring in part and dissenting in part, in which SOUTER and GINSBURG, JJ., joined, *post*, p. 30.

*Javier H. Rubinstein* argued the cause for petitioner. With him on the briefs were *Gary S. Feinerman* and *Noel G. Lawrence.*

*Roy W. McLeese III* argued the cause for the United States. With him on the brief were *Solicitor General Waxman, Assistant Attorney General Robinson,* and *Deputy Solicitor General Dreeben.*\*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

Petitioner was tried on charges of violating a number of federal criminal statutes penalizing fraud. It is agreed that the District Court erred in refusing to submit the issue of materiality to the jury with respect to those charges involving tax fraud. See *United States* v. *Gaudin,* 515 U. S. 506 (1995). We hold that the harmless-error rule of *Chapman* v. *California,* 386 U. S. 18 (1967), applies to this error. We also hold that materiality is an element of the federal mail fraud, wire fraud, and bank fraud statutes under which petitioner was also charged.

I

In the mid-1980's, petitioner Ellis E. Neder, Jr., an attorney and real estate developer in Jacksonville, Florida, engaged in a number of real estate transactions financed by fraudulently obtained bank loans. Between 1984 and 1986, Neder purchased 12 parcels of land using shell corporations set up by his attorneys and then immediately resold the land at much higher prices to limited partnerships that he con-

---

\*Briefs of *amici curiae* urging reversal were filed for the American Council of Life Insurance et al. by *James F. Fitzpatrick* and *Nancy L. Perkins;* and for the National Association of Criminal Defense Lawyers by *Roger W. Yoerges* and *Lisa Kemler.*

trolled.   Using inflated appraisals, Neder secured bank loans that typically amounted to 70% to 75% of the inflated resale price of the land.   In so doing, he concealed from lenders that he controlled the shell corporations, that he had purchased the land at prices substantially lower than the inflated resale prices, and that the limited partnerships had not made substantial down payments as represented.   In several cases, Neder agreed to sign affidavits falsely stating that he had no relationship to the shell corporations and that he was not sharing in the profits from the inflated land sales. By keeping for himself the amount by which the loan proceeds exceeded the original purchase price of the land, Neder was able to obtain more than $7 million.   He failed to report nearly all of this money on his personal income tax returns. He eventually defaulted on the loans.

Neder also engaged in a number of schemes involving land development fraud.   In 1985, he obtained a $4,150,000 construction loan to build condominiums on a project known as Cedar Creek.   To obtain the loan, he falsely represented to the lender that he had satisfied a condition of the loan by making advance sales of 20 condominium units.   In fact, he had been unable to meet the condition, so he secured additional buyers by making their down payments himself.   He then had the down payments transferred back to him from the escrow accounts into which they had been placed. Neder later defaulted on the loan without repaying any of the principal.   He employed a similar scheme to obtain a second construction loan of $5,400,000, and unsuccessfully attempted to obtain an additional loan in the same manner.

Neder also obtained a consolidated $14 million land acquisition and development loan for a project known as Reddie Point.   Pursuant to the loan, Neder could request funds for work actually performed on the project.   Between September 1987 and March 1988, he submitted numerous requests based on false invoices, the lender approved the requests,

and he obtained almost $3 million unrelated to any work actually performed.

Neder was indicted on, among other things, 9 counts of mail fraud, in violation of 18 U. S. C. § 1341; 9 counts of wire fraud, in violation of § 1343; 12 counts of bank fraud, in violation of § 1344; and 2 counts of filing a false income tax return, in violation of 26 U. S. C. § 7206(1). The fraud counts charged Neder with devising and executing various schemes to defraud lenders in connection with the land acquisition and development loans, totaling over $40 million. The tax counts charged Neder with filing false statements of income on his tax returns. According to the Government, Neder failed to report more than $1 million in income for 1985 and more than $4 million in income for 1986, both amounts reflecting profits Neder obtained from the fraudulent real estate loans.

In accordance with then-extant Circuit precedent and over Neder's objection, the District Court instructed the jury that, to convict on the tax offenses, it "need not consider" the materiality of any false statements "even though that language is used in the indictment." App. 256. The question of materiality, the court instructed, "is not a question for the jury to decide." *Ibid.* The court gave a similar instruction on bank fraud, *id.,* at 249, and subsequently found, outside the presence of the jury, that the evidence established the materiality of all the false statements at issue, *id.,* at 167. In instructing the jury on mail fraud and wire fraud, the District Court did not include materiality as an element of either offense. *Id.,* at 253–255. Neder again objected to the instruction. The jury convicted Neder of the fraud and tax offenses, and he was sentenced to 147 months' imprisonment, 5 years' supervised release, and $25 million in restitution.

The Court of Appeals for the Eleventh Circuit affirmed the conviction. 136 F. 3d 1459 (1998). It held that the District Court erred under our intervening decision in *United States*

v. *Gaudin,* 515 U. S. 506 (1995), in failing to submit the materiality element of the tax offense to the jury. It concluded, however, that the error was subject to harmless-error analysis and, further, that the error was harmless because "materiality was not in dispute," 136 F. 3d, at 1465, and thus the error " 'did not contribute to the verdict obtained,' " *ibid.* (quoting *Yates* v. *Evatt,* 500 U. S. 391, 403 (1991)). The Court of Appeals also held that materiality is not an element of the mail fraud, wire fraud, and bank fraud statutes, and thus the District Court did not err in failing to submit the question of materiality to the jury.

We granted certiorari, 525 U. S. 928 (1998), to resolve a conflict in the Courts of Appeals on two questions: (1) whether, and under what circumstances, the omission of an element from the judge's charge to the jury can be harmless error, and (2) whether materiality is an element of the federal mail fraud, wire fraud, and bank fraud statutes.

## II

Rule 52(a) of the Federal Rules of Criminal Procedure, which governs direct appeals from judgments of conviction in the federal system, provides that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." Although this Rule by its terms applies to *all* errors where a proper objection is made at trial, we have recognized a limited class of fundamental constitutional errors that "defy analysis by 'harmless error' standards." *Arizona* v. *Fulminante,* 499 U. S. 279, 309 (1991); see *Chapman* v. *California,* 386 U. S., at 23. Errors of this type are so intrinsically harmful as to require automatic reversal (*i. e.,* "affect substantial rights") without regard to their effect on the outcome. For all other constitutional errors, reviewing courts must apply Rule 52(a)'s harmless-error analysis and must "disregar[d]" errors that are harmless "beyond a reasonable doubt." *Id.,* at 24.

In this case the Government does not dispute that the District Court erred under *Gaudin* in deciding the materiality element of a § 7206(1) offense itself, rather than submitting the issue to the jury. See Brief for United States 10, and n. 1. We must decide whether the error here is subject to harmless-error analysis and, if so, whether the error was harmless.

### A

We have recognized that "most constitutional errors can be harmless." *Fulminante, supra,* at 306. "[I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis." *Rose* v. *Clark,* 478 U. S. 570, 579 (1986). Indeed, we have found an error to be "structural," and thus subject to automatic reversal, only in a "very limited class of cases." *Johnson* v. *United States,* 520 U. S. 461, 468 (1997) (citing *Gideon* v. *Wainwright,* 372 U. S. 335 (1963) (complete denial of counsel); *Tumey* v. *Ohio,* 273 U. S. 510 (1927) (biased trial judge); *Vasquez* v. *Hillery,* 474 U. S. 254 (1986) (racial discrimination in selection of grand jury); *McKaskle* v. *Wiggins,* 465 U. S. 168 (1984) (denial of self-representation at trial); *Waller* v. *Georgia,* 467 U. S. 39 (1984) (denial of public trial); *Sullivan* v. *Louisiana,* 508 U. S. 275 (1993) (defective reasonable-doubt instruction)).

The error at issue here—a jury instruction that omits an element of the offense—differs markedly from the constitutional violations we have found to defy harmless-error review. Those cases, we have explained, contain a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Fulminante, supra,* at 310. Such errors "infect the entire trial process," *Brecht* v. *Abrahamson,* 507 U. S. 619, 630 (1993), and "necessarily render a trial fundamentally unfair," *Rose,* 478 U. S., at 577. Put another way, these errors deprive defendants of "basic protections" without which "a criminal

trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair." *Id.,* at 577–578.

Unlike such defects as the complete deprivation of counsel or trial before a biased judge, an instruction that omits an element of the offense does not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence. Our decision in *Johnson* v. *United States, supra,* is instructive. *Johnson* was a perjury prosecution in which, as here, the element of materiality was decided by the judge rather than submitted to the jury. The defendant failed to object at trial, and we thus reviewed her claim for "plain error." Although reserving the question whether the omission of an element *ipso facto* " 'affect[s] substantial rights,' " 520 U. S., at 468–469, we concluded that the error did not warrant correction in light of the " 'overwhelming' " and "uncontroverted" evidence supporting materiality, *id.,* at 470. Based on this evidence, we explained, the error did not " 'seriously affec[t] the fairness, integrity or public reputation of judicial proceedings.' " *Id.,* at 469 (quoting *United States* v. *Olano,* 507 U. S. 725, 736 (1993)).

That conclusion cuts against the argument that the omission of an element will *always* render a trial unfair. In fact, as this case shows, quite the opposite is true: Neder was tried before an impartial judge, under the correct standard of proof and with the assistance of counsel; a fairly selected, impartial jury was instructed to consider all of the evidence and argument in respect to Neder's defense against the tax charges. Of course, the court erroneously failed to charge the jury on the element of materiality, but that error did not render Neder's trial "fundamentally unfair," as that term is used in our cases.

We have often applied harmless-error analysis to cases involving improper instructions on a single element of the offense. See, *e. g., Yates* v. *Evatt,* 500 U. S. 391 (1991)

(mandatory rebuttable presumption); *Carella* v. *California*, 491 U. S. 263 (1989) *(per curiam)* (mandatory conclusive presumption); *Pope* v. *Illinois*, 481 U. S. 497 (1987) (misstatement of element); *Rose, supra* (mandatory rebuttable presumption). In other cases, we have recognized that improperly omitting an element from the jury can "easily be analogized to improperly instructing the jury on an element of the offense, an error which is subject to harmless-error analysis." *Johnson, supra*, at 469 (citations omitted); see also *California* v. *Roy*, 519 U. S. 2, 5 (1996) *(per curiam)* ("The specific error at issue here—an error in the instruction that defined the crime—is . . . as easily characterized as a 'misdescription of an element' of the crime, as it is characterized as an error of 'omission'"). In both cases—misdescriptions and omissions—the erroneous instruction precludes the jury from making a finding on the *actual* element of the offense. The same, we think, can be said of conclusive presumptions, which direct the jury to presume an *ultimate* element of the offense based on proof of certain *predicate* facts (*e. g.*, "You must presume malice if you find an intentional killing"). Like an omission, a conclusive presumption deters the jury from considering any evidence other than that related to the predicate facts (*e. g.*, an intentional killing) and "directly foreclose[s] independent jury consideration of whether the facts proved established certain elements of the offens[e]" (*e. g.*, malice). *Carella*, 491 U. S., at 266; see *id.*, at 270 (SCALIA, J., concurring in judgment).

The conclusion that the omission of an element is subject to harmless-error analysis is consistent with the holding (if not the entire reasoning) of *Sullivan* v. *Louisiana*, the case upon which Neder principally relies. In *Sullivan*, the trial court gave the jury a defective "reasonable doubt" instruction in violation of the defendant's Fifth and Sixth Amendment rights to have the charged offense proved beyond a reasonable doubt. See *Cage* v. *Louisiana*, 498 U. S. 39 (1990) *(per curiam)*. Applying our traditional mode of anal-

ysis, the Court concluded that the error was not subject to harmless-error analysis because it "vitiates *all* the jury's findings," 508 U. S., at 281, and produces "consequences that are necessarily unquantifiable and indeterminate," *id.*, at 282. By contrast, the jury-instruction error here did not "vitiat[e] *all* the jury's findings." *Id.*, at 281; see *id.*, at 284 (REHNQUIST, C. J., concurring). It did, of course, prevent the jury from making a finding on the element of materiality.

Neder argues that *Sullivan*'s alternative reasoning precludes the application of harmless error here. Under that reasoning, harmless-error analysis cannot be applied to a constitutional error that precludes the jury from rendering a verdict of guilty-beyond-a-reasonable-doubt because "the entire premise of *Chapman* review is simply absent." *Id.*, at 280. In the absence of an *actual* verdict of guilty-beyond-a-reasonable-doubt, the Court explained: "[T]he question whether the *same* verdict of guilty-beyond-a-reasonable-doubt would have been rendered absent the constitutional error is utterly meaningless. There is no *object*, so to speak, upon which the harmless-error scrutiny can operate." *Ibid.;* see *Carella, supra,* at 268–269 (SCALIA, J., concurring in judgment). Neder argues that this analysis applies with equal force where the constitutional error, as here, prevents the jury from rendering a "complete verdict" on *every* element of the offense. As in *Sullivan*, Neder argues, the basis for harmless-error review " 'is simply absent.' " Brief for Petitioner 7.

Although this strand of the reasoning in *Sullivan* does provide support for Neder's position, it cannot be squared with our harmless-error cases. In *Pope,* for example, the trial court erroneously instructed the jury that it could find the defendant guilty in an obscenity prosecution if it found that the allegedly obscene material lacked serious value under "community standards," rather than the correct "reasonable person" standard required by the First Amendment. 481 U. S., at 499–501. Because the jury was not properly

12

instructed, and consequently did not render a finding, on the *actual* element of the offense, the defendant's trial did not result in a "complete verdict" any more than in this case. Yet we held there that harmless-error analysis was appropriate. *Id.*, at 502–503.

Similarly, in *Carella*, the jury was instructed to presume that the defendant "embezzled [a] vehicle" and "[i]nten[ded] to commit theft" if the jury found that the defendant failed to return a rental car within a certain number of days after the expiration of the rental period. 491 U. S., at 264 (internal quotation marks omitted). Again, the jury's finding of guilt cannot be seen as a "complete verdict" because the conclusive presumption "directly foreclosed independent jury consideration of whether the facts proved established certain elements of the offenses." *Id.*, at 266. As in *Pope*, however, we held that the unconstitutional conclusive presumption was "subject to the harmless-error rule." 491 U. S., at 266.

And in *Roy*, a federal habeas case involving a state-court murder conviction, the trial court erroneously failed to instruct the jury that it could convict the defendant as an aider and abettor only if it found that the defendant had the "intent or purpose" of aiding the confederate's crime. 519 U. S., at 3 (internal quotation marks and emphasis omitted). Despite that omission, we held that "[t]he case before us is a case for application of the 'harmless error' standard." *Id.*, at 5.

The Government argues, correctly we think, that the absence of a "complete verdict" on every element of the offense establishes no more than that an improper instruction on an element of the offense violates the Sixth Amendment's jury trial guarantee. The issue here, however, is not whether a jury instruction that omits an element of the offense was error (a point that is uncontested, see *supra*, at 8), but whether the error is subject to harmless-error analysis. We

think our decisions in *Pope, Carella,* and *Roy* dictate the answer to that question.

Forced to accept that this Court has applied harmless-error review in cases where the jury did not render a "complete verdict" on every element of the offense, Neder attempts to reconcile our cases by offering an approach gleaned from a plurality opinion in *Connecticut v. Johnson,* 460 U. S. 73 (1983), an opinion concurring in the judgment in *Carella, supra,* and language in *Sullivan, supra.* Under this restrictive approach, an instructional omission, misdescription, or conclusive presumption can be subject to harmless-error analysis only in three "rare situations": (1) where the defendant is acquitted of the offense on which the jury was improperly instructed (and, despite the defendant's argument that the instruction affected another count, the improper instruction had no bearing on it); (2) where the defendant admitted the element on which the jury was improperly instructed; and (3) where other facts necessarily found by the jury are the "functional equivalent" of the omitted, misdescribed, or presumed element. See *Sullivan, supra,* at 281; *Carella, supra,* at 270–271 (SCALIA, J., concurring in judgment); *Johnson, supra,* at 87 (plurality opinion). Neder understandably contends that *Pope, Carella,* and *Roy* fall within this last exception, which explains why the Court in those cases held that the instructional error could be harmless.

We believe this approach is mistaken for more than one reason. As an initial matter, we are by no means certain that the cases just mentioned meet the "functional equivalence" test as Neder at times articulates it. See Brief for Petitioner 29 ("[A]ppellate courts [cannot be] given even the slightest latitude to review the record to 'fill the gaps' in a jury verdict, as 'minor' as those gaps may seem"). In *Pope,* for example, there was necessarily a "gap" between what the jury did find (that the allegedly obscene material lacked value under "community standards") and what it was re-

quired to find to convict (that the material lacked value under a national "reasonable person" standard). Petitioner's submission would have mandated reversal for a new trial in that case, because a juror in Rockford, Illinois, who found that the material lacked value under community standards, would not necessarily have found that it did so under presumably broader and more tolerant national standards. But since we held that harmless-error analysis was appropriate in *Pope*, that case not only does not support petitioner's approach, but rejects it.

Petitioner's submission also imports into the initial structural-error determination (*i. e.*, whether an error is structural) a case-by-case approach that is more consistent with our traditional harmless-error inquiry (*i. e.*, whether an error is harmless). Under our cases, a constitutional error is either structural or it is not. Thus, even if we were inclined to follow a broader "functional equivalence" test (*e. g.*, where other facts found by the jury are "so closely related" to the omitted element "that no rational jury could find those facts without also finding" the omitted element, *Sullivan*, 508 U. S., at 281 (internal quotation marks omitted)), such a test would be inconsistent with our traditional categorical approach to structural errors.

We also note that the present case arose in the legal equivalent of a laboratory test tube. The trial court, following existing law, ruled that the question of materiality was for the court, not the jury. It therefore refused a charge on the question of materiality. But future cases are not likely to be so clear cut. In *Roy*, we said that the error in question could be "as easily characterized as a 'misdescription of an element' of the crime, as it is characterized as an error of 'omission.'" 519 U. S., at 5. As petitioner concedes, his submission would thus call into question the far more common subcategory of misdescriptions. And it would require a reviewing court in each case to determine just how serious a "misdescription" it was.

Difficult as such issues would be when dealing with the ample volume defining federal crimes, they would be measurably compounded by the necessity for federal courts, reviewing state convictions under 28 U. S. C. §2254, to ascertain the elements of the offense as defined in the laws of 50 different States.

It would not be illogical to extend the reasoning of *Sullivan* from a defective "reasonable doubt" instruction to a failure to instruct on an element of the crime. But, as indicated in the foregoing discussion, the matter is not *res nova* under our case law. And if the life of the law has not been logic but experience, see O. Holmes, The Common Law 1 (1881), we are entitled to stand back and see what would be accomplished by such an extension in this case. The omitted element was materiality. Petitioner underreported $5 million on his tax returns, and did not contest the element of materiality at trial. Petitioner does not suggest that he would introduce any evidence bearing upon the issue of materiality if so allowed. Reversal without any consideration of the effect of the error upon the verdict would send the case back for retrial—a retrial not focused at all on the issue of materiality, but on contested issues on which the jury was properly instructed. We do not think the Sixth Amendment requires us to veer away from settled precedent to reach such a result.

B

Having concluded that the omission of an element is an error that is subject to harmless-error analysis, the question remains whether Neder's conviction can stand because the error was harmless. In *Chapman* v. *California*, 386 U. S. 18 (1967), we set forth the test for determining whether a constitutional error is harmless. That test, we said, is whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.*, at 24; see *Delaware* v. *Van Arsdall*, 475 U. S. 673, 681 (1986) ("[A]n otherwise valid conviction should not

be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt").

To obtain a conviction on the tax offense at issue, the Government must prove that the defendant filed a tax return "which he does not believe to be true and correct as to every material matter." 26 U. S. C. § 7206(1). In general, a false statement is material if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." *United States* v. *Gaudin,* 515 U. S., at 509 (quoting *Kungys* v. *United States,* 485 U. S. 759, 770 (1988) (internal quotation marks omitted)). In a prosecution under § 7206(1), several courts have determined that "any failure to report income is material." *United States* v. *Holland,* 880 F. 2d 1091, 1096 (CA9 1989); see 136 F. 3d, at 1465 (collecting cases). Under either of these formulations, no jury could reasonably find that Neder's failure to report substantial amounts of income on his tax returns was not "a material matter."[1]

At trial, the Government introduced evidence that Neder failed to report over $5 million in income from the loans he obtained. The failure to report such substantial income incontrovertibly establishes that Neder's false statements were material to a determination of his income tax liability. The evidence supporting materiality was so overwhelming, in fact, that Neder did not argue to the jury—and does not argue here—that his false statements of income could be found immaterial. Instead, he defended against the tax charges by arguing that the loan proceeds were not income

---

[1] JUSTICE STEVENS says that the failure to charge the jury on materiality is harmless error in this case because the jury verdict "necessarily included a finding on that issue." *Post,* at 26 (opinion concurring in part and concurring in judgment). While the evidence of materiality is overwhelming, it is incorrect to say that the jury made such a finding; the court explicitly directed the jury not to consider the materiality of any false statements.

because he intended to repay the loans, and that he reasonably believed, based on the advice of his accountant and lawyer, that he need not report the proceeds as income. App. 208–211, 235 (closing argument). In this situation, where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless. We think it beyond cavil here that the error "did not contribute to the verdict obtained." *Chapman, supra,* at 24.

Neder disputes our conclusion that the error in this case was harmless. Relying on language in our *Sullivan* and *Yates* decisions, he argues that a finding of harmless error may be made only upon a determination that the jury rested its verdict on evidence that its instructions allowed it to consider. See *Sullivan,* 508 U. S., at 279; *Yates,* 500 U. S., at 404. To rely on overwhelming record evidence of guilt the jury did not *actually* consider, he contends, would be to dispense with trial by jury and allow judges to direct a guilty verdict on an element of the offense.[2]

But at bottom this is simply another form of the argument that a failure to instruct on any element of the crime is not subject to harmless-error analysis. *Yates* involved constitutionally infirm presumptions on an issue that was the crux of the case—the defendant's intent. But in the case of an omitted element, as the present one, the jury's instructions preclude any consideration of evidence relevant to the omit-

---

[2] JUSTICE SCALIA, in his opinion concurring in part and dissenting in part, also suggests that if a failure to charge on an uncontested element of the offense may be harmless error, the next step will be to allow a directed verdict against a defendant in a criminal case contrary to *Rose* v. *Clark,* 478 U. S. 570, 578 (1986). Happily, our course of constitutional adjudication has not been characterized by this "in for a penny, in for a pound" approach. We have no hesitation reaffirming *Rose* at the same time that we subject the narrow class of cases like the present one to harmless-error review.

ted element, and thus there could be no harmless-error analysis. Since we have previously concluded that harmless-error analysis is appropriate in such a case, we must look to other cases decided under *Chapman* for the proper mode of analysis.

The erroneous admission of evidence in violation of the Fifth Amendment's guarantee against self-incrimination, see *Arizona* v. *Fulminante,* 499 U. S. 279 (1991), and the erroneous exclusion of evidence in violation of the right to confront witnesses guaranteed by the Sixth Amendment, see *Delaware* v. *Van Arsdall,* 475 U. S. 673 (1986), are both subject to harmless-error analysis under our cases. Such errors, no less than the failure to instruct on an element in violation of the right to a jury trial, infringe upon the jury's fact-finding role and affect the jury's deliberative process in ways that are, strictly speaking, not readily calculable. We think, therefore, that the harmless-error inquiry must be essentially the same: Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error? To set a barrier so high that it could never be surmounted would justify the very criticism that spawned the harmless-error doctrine in the first place: "Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it." R. Traynor, The Riddle of Harmless Error 50 (1970).

We believe that where an omitted element is supported by uncontroverted evidence, this approach reaches an appropriate balance between "society's interest in punishing the guilty [and] the method by which decisions of guilt are to be made." *Connecticut* v. *Johnson,* 460 U. S., at 86 (plurality opinion). The harmless-error doctrine, we have said, "recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, . . . and promotes public respect for the criminal process by focusing on the underlying fairness of the trial."

*Van Arsdall, supra,* at 681. At the same time, we have recognized that trial by jury in serious criminal cases "was designed 'to guard against a spirit of oppression and tyranny on the part of rulers,' and 'was from very early times insisted on by our ancestors in the parent country, as the great bulwark of their civil and political liberties.'" *Gaudin,* 515 U. S., at 510–511 (quoting 2 J. Story, Commentaries on the Constitution of the United States 540–541 (4th ed. 1873)). In a case such as this one, where a defendant did not, and apparently could not, bring forth facts contesting the omitted element, answering the question whether the jury verdict would have been the same absent the error does not fundamentally undermine the purposes of the jury trial guarantee.

Of course, safeguarding the jury guarantee will often require that a reviewing court conduct a thorough examination of the record. If, at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding—it should not find the error harmless.

A reviewing court making this harmless-error inquiry does not, as Justice Traynor put it, "become in effect a second jury to determine whether the defendant is guilty." Traynor, *supra,* at 21. Rather a court, in typical appellate-court fashion, asks whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element. If the answer to that question is "no," holding the error harmless does not "reflec[t] a denigration of the constitutional rights involved." *Rose,* 478 U. S., at 577. On the contrary, it "serve[s] a very useful purpose insofar as [it] block[s] setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial." *Chapman,* 386 U. S., at 22. We thus hold that the District Court's failure to submit the

element of materiality to the jury with respect to the tax charges was harmless error.

## III

We also granted certiorari in this case to decide whether materiality is an element of a "scheme or artifice to defraud" under the federal mail fraud (18 U. S. C. § 1341), wire fraud (§ 1343), and bank fraud (§ 1344) statutes. The Court of Appeals concluded that the failure to submit materiality to the jury was not error because the fraud statutes do not require that a "scheme to defraud" employ *material* falsehoods. We disagree.

Under the framework set forth in *United States* v. *Wells,* 519 U. S. 482 (1997), we first look to the text of the statutes at issue to discern whether they require a showing of materiality. In this case, we need not dwell long on the text because, as the parties agree, none of the fraud statutes defines the phrase "scheme or artifice to defraud," or even mentions materiality. Although the mail fraud and wire fraud statutes contain different jurisdictional elements (§ 1341 requires use of the mails while § 1343 requires use of interstate wire facilities), they both prohibit, in pertinent part, "any scheme or artifice to defraud" or to obtain money or property "by means of false or fraudulent pretenses, representations, or promises."[3] The bank fraud statute, which was modeled on

---

[3] Section 1341 provides in pertinent part:

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such

the mail and wire fraud statutes, similarly prohibits any "scheme or artifice to defraud a financial institution" or to obtain any property of a financial institution "by false or fraudulent pretenses, representations, or promises."[4]   Thus, based solely on a "natural reading of the full text," *id.*, at 490, materiality would not be an element of the fraud statutes.

That does not end our inquiry, however, because in interpreting statutory language there is a necessary second step. It is a well-established rule of construction that " '[w]here Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.' "   *Nationwide Mut. Ins. Co.* v. *Darden,* 503 U. S. 318, 322 (1992) (quoting *Community for Creative Non-Violence* v. *Reid,* 490 U. S.

---

matter or thing, shall be fined under this title or imprisoned not more than five years, or both.   If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both."

Section 1343 provides:

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both.   If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both."

[4] Section 1344 provides:

"Whoever knowingly executes, or attempts to execute, a scheme or artifice—

"(1)  to defraud a financial institution; or

"(2)  to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;

"shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both."

730, 739 (1989)); see *Standard Oil Co. of N. J.* v. *United States,* 221 U. S. 1, 59 (1911) ("[W]here words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country, they are presumed to have been used in that sense"). Neder contends that "defraud" is just such a term, and that Congress implicitly incorporated its common-law meaning, including its requirement of materiality,[5] into the statutes at issue.

The Government does not dispute that both at the time of the mail fraud statute's original enactment in 1872, and later when Congress enacted the wire fraud and bank fraud statutes, actionable "fraud" had a well-settled meaning at common law. Nor does it dispute that the well-settled meaning of "fraud" required a misrepresentation or concealment of *material* fact. Indeed, as the sources we are aware of demonstrate, the common law could not have conceived of "fraud" without proof of materiality. See *BMW of North America, Inc.* v. *Gore,* 517 U. S. 559, 579 (1996) ("[A]ctionable fraud requires a *material* misrepresentation or omission" (citing Restatement (Second) of Torts § 538 (1977); W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 108 (5th ed. 1984))); *Smith* v. *Richards,* 13 Pet. 26, 39 (1839) (in an action "to set aside a contract for fraud" a "misrepresentation must be of something material"); see also 1 J. Story, Commentaries on Equity Jurisprudence § 195 (10th ed. 1870) ("In the first place, the misrepresentation must be of something material, constituting an inducement or motive to the act or omission of the other

---

[5] The Restatement instructs that a matter is material if:

"(a) a reasonable man would attach importance to its existence or non-existence in determining his choice of action in the transaction in question; or

"(b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it." Restatement (Second) of Torts § 538 (1977).

party"). Thus, under the rule that Congress intends to incorporate the well-settled meaning of the common-law terms it uses, we cannot infer from the absence of an express reference to materiality that Congress intended to drop that element from the fraud statutes.[6] On the contrary, we must *presume* that Congress intended to incorporate materiality "'unless the statute otherwise dictates.'" *Nationwide Mut. Ins., supra,* at 322.[7]

The Government attempts to rebut this presumption by arguing that the term "defraud" would bear its common-law meaning only if the fraud statutes "indicated that Congress had codified the crime of false pretenses or one of the common-law torts sounding in fraud." Brief for United States 37. Instead, the Government argues, Congress chose

---

[6] We concluded as much in *Field* v. *Mans,* 516 U. S. 59, 69 (1995):

"'[F]alse pretenses, a false representation, or actual frau[d]' carry the acquired meaning of terms of art. They are common-law terms, and . . . they imply elements that the common law has defined them to include. . . . Congress could have enumerated their elements, but Congress's contrary drafting choice did not deprive them of a significance richer than the bare statement of their terms."

[7] The Government argues that because Congress has provided express materiality requirements in other statutes prohibiting fraudulent conduct, the absence of such an express reference in the fraud statutes at issue "'speaks volumes.'" Brief for United States 35 (citing 21 U. S. C. §843(a)(4)(A)) (prohibiting the furnishing of "false or fraudulent material information" in documents required under federal drug laws); 26 U. S. C. §6700(a)(2)(A) (criminalizing the making of a statement regarding investment tax benefits that an individual "knows or has reason to kno[w] is false or fraudulent as to any material matter"). These later enacted statutes, however, differ from the fraud statutes here in that they prohibit both "false" and "fraudulent" statements or information. Because the term "false statement" does not imply a materiality requirement, *United States* v. *Wells,* 519 U. S. 482, 491 (1997), the word "material" limits the statutes' scope to material falsehoods. Moreover, these statutes cannot rebut the presumption that Congress intended to incorporate the common-law meaning of the term "fraud" in the mail fraud, wire fraud, and bank fraud statutes. That rebuttal can only come from the text or structure of the fraud statutes themselves. See *Nationwide Mut. Ins.,* 503 U. S., at 322.

to unmoor the mail fraud statute from its common-law ana-
logs by punishing, not the completed fraud, but rather any
person "having devised or intending to devise any scheme
or artifice to defraud." Read in this light, the Government
contends, there is no basis to infer that Congress intended
to limit criminal liability to conduct that would constitute
"fraud" at common law, and in particular, to *material* mis-
representations or omissions. Rather, criminal liability
would exist so long as the defendant *intended* to deceive the
victim, even if the particular means chosen turn out to be
immaterial, *i. e.*, incapable of influencing the intended victim.
See n. 3, *supra.*

The Government relies heavily on *Durland* v. *United
States*, 161 U. S. 306 (1896), our first decision construing the
mail fraud statute, to support its argument that the fraud
statutes sweep more broadly than common-law fraud. But
*Durland* was different from this case. There, the defend-
ant, who had used the mails to sell bonds he did not intend
to honor, argued that he could not be held criminally liable
because his conduct did not fall within the scope of the
common-law crime of "false pretenses." We rejected the
argument that "the statute reaches only such cases as, at
common law, would come within the definition of 'false
pretenses,' in order to make out which there must be a
misrepresentation as to some existing fact and not a mere
promise as to the future." *Id.*, at 312. Instead, we con-
strued the statute to "includ[e] everything designed to de-
fraud by representations as to the past or present, or sugges-
tions and promises as to the future." *Id.*, at 313. Although
*Durland* held that the mail fraud statute reaches conduct
that would not have constituted "false pretenses" at common
law, it did not hold, as the Government argues, that the stat-
ute encompasses more than common-law fraud.

In one sense, the Government is correct that the fraud
statutes did not incorporate *all* the elements of common-law
fraud. The common-law requirements of "justifiable reli-

ance" and "damages," for example, plainly have no place in the federal fraud statutes. See, *e. g., United States* v. *Stewart,* 872 F. 2d 957, 960 (CA10 1989) ("[Under the mail fraud statute,] the government does not have to prove actual reliance upon the defendant's misrepresentations"); *United States* v. *Rowe,* 56 F. 2d 747, 749 (CA2) (L. Hand, J.) ("Civilly of course the [mail fraud statute] would fail without proof of damage, but that has no application to criminal liability"), cert. denied, 286 U. S. 554 (1932). By prohibiting the "scheme to defraud," rather than the completed fraud, the elements of reliance and damage would clearly be inconsistent with the statutes Congress enacted. But while the language of the fraud statutes is incompatible with these requirements, the Government has failed to show that this language is inconsistent with a materiality requirement.

Accordingly, we hold that materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes. Consistent with our normal practice where the court below has not yet passed on the harmlessness of any error, see *Carella,* 491 U. S., at 266–267, we remand this case to the Court of Appeals for it to consider in the first instance whether the jury-instruction error was harmless.

## IV

The judgment of the Court of Appeals respecting the tax fraud counts is affirmed. The judgment of the Court of Appeals on the remaining counts is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, concurring in part and concurring in the judgment.

Although I do not agree with the Court's analysis of the harmless-error issue in Part II of its opinion, I do join Parts I and III and concur in the judgment.

26

## I

This is an easy case. The federal tax fraud statute, 26 U. S. C. § 7206(1), prohibits the filing of any return that the taxpayer "does not believe to be true and correct as to *every material matter*." * (Emphasis added.) The Court of Appeals, in accordance with other courts, construed "material matter" to describe "any information necessary to a determination of a taxpayer's income tax liability." 136 F. 3d 1459, 1465 (CA11 1998) (citing *United States* v. *Aramony*, 88 F. 3d 1369, 1384 (CA4 1996); *United States* v. *Klausner*, 80 F. 3d 55, 60 (CA2 1996); *United States* v. *Holland*, 880 F. 2d 1091, 1096 (CA9 1989)). Petitioner has not challenged this legal standard.

The jury found that petitioner knowingly and "falsely reported [his] total income in his 1985 return . . . and in his 1986 return." App. 256 (jury instructions). A taxpayer's "total income" is obviously "information necessary to a determination of a taxpayer's income tax liability." 136 F. 3d, at 1465. The jury verdict, therefore, was not merely the functional equivalent of a finding on any possible materiality issue; it necessarily included a finding on that issue. That being so, the trial judge's failure to give a separate instruction on that issue was harmless error under any test of harmlessness.

But the Court does not rest its decision on this logic. Rather, it finds the instructional error harmless because petitioner "did not, and apparently could not, bring forth

---

*Section 7206 provides, in relevant part:

"Any person who—

"(1) Declaration under penalties of perjury.

"Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that is made under the penalties of perjury, and which he does not believe to be true and correct as to *every material matter* . . .

"shall be guilty of a felony."

facts contesting the omitted element." *Ante,* at 19. I cannot subscribe to this analysis. However the standard for deciding whether a trial error was harmless is formulated, I understand that there may be disagreement over its application in particular cases. The three contrasting opinions in *Arizona* v. *Fulminante,* 499 U. S. 279 (1991), vividly illustrate this point: Justice White stated that the admission of a defendant's coerced confession, by its very nature, could never be harmless, *id.,* at 295–302; JUSTICE KENNEDY stated that such evidence can be harmless but that the appellate court "must appreciate the indelible impact a full confession may have on the trier of fact," *id.,* at 313 (opinion concurring in judgment); and THE CHIEF JUSTICE, joined by JUSTICE SCALIA, stated that the admission of such evidence presents "a classic case of harmless error" when other evidence points strongly toward guilt, *id.,* at 312 (dissenting opinion). There is, nevertheless, a distinction of true importance between a harmless-error test that focuses on what the jury did decide, rather than on what appellate judges think the jury would have decided if given an opportunity to pass on an issue. That is why, in my view, the "harmless-error doctrine may enable a court to remove a taint from proceedings in order to *preserve* a jury's findings, but it cannot constitutionally *supplement* those findings." *Pope* v. *Illinois,* 481 U. S. 497, 509 (1987) (STEVENS, J., dissenting).

The Court of Appeals' judgment could, and should, be affirmed on the ground that the jury verdict in this case necessarily included a finding that petitioner's tax returns were not "true and correct as to every material matter." I therefore cannot join the analysis in Part II of the Court's opinion, which—without explaining why the jury failed necessarily to find a material omission—states that judges may find elements of an offense satisfied whenever the defendant failed to contest the element or raise evidence sufficient to support a contrary finding. My views on this central issue are thus close to those expressed by JUSTICE SCALIA, but I do not

join his dissenting opinion because it is internally inconsistent and its passion is misdirected.

## II

If the Court's tolerance of the trial judge's Sixth Amendment error in this case were, as JUSTICE SCALIA's dissent suggests, *post*, at 30, as serious as malpractice on "the spinal column of American democracy," surely the error would require reversal of the conviction regardless of whether defense counsel made a timely objection. Yet the dissent states that reversal is appropriate only when a defendant made a timely objection to the deprivation. *Post*, at 35 (opinion concurring in part and dissenting in part). It is for that reason that I find tension between the force of JUSTICE SCALIA's eloquent rhetoric and the far narrower rule that he actually espouses.

There is even more tension between that rhetoric and his perception of the proper role of the jury in cases that are far more controversial than the prosecution of white-collar crimes. The history that he recounts provides powerful support for my view that this Court has not been properly sensitive to the importance of protecting the right to have a jury resolve critical issues of fact when there is a special danger that elected judges may listen to the voices of voters rather than witnesses. A First Amendment case and a capital case will illustrate my point.

In *Pope*, we found constitutional error in the conviction of two attendants in an adult bookstore because the trial court had instructed the jury to answer the question whether certain magazines lacked "serious literary, artistic, political, or scientific value" by applying the community standards that prevailed in Illinois. 481 U. S., at 500–501. As the history of many of our now-valued works of art demonstrates, this error would have permitted the jury to resolve the issue against the defendants based on their appraisal of the views of the majority of Illinois' citizens despite the fact that under

a proper instruction the jury would have acquitted if they thought a more discerning minority would have found true artistic value in the publications. Indeed, under the instruction given to the jury in that case, James Joyce would surely have been convicted for selling copies of the first edition of Ulysses in Rockford, Illinois, even though there were a few readers in Paris who immediately recognized the value of his work. The *Pope* Court's conclusion that the unconstitutional instruction might have been harmless entirely ignored the danger that individual distaste for sexually explicit materials may subconsciously influence a judge's evaluation of how a jury would decide a question that it did not actually resolve. It is, in fact, particularly distressing that all of my colleagues appear today to endorse *Pope's* harmless-error analysis.

Admittedly, that endorsement is consistent with the holding in Part II of the Court's opinion in *Walton* v. *Arizona*, 497 U. S. 639, 647–649 (1990), that a judge may make the factual findings that render a defendant eligible for the death penalty. As I have previously argued, however, that holding was not faithful to the history that was reviewed by "the wise and inspiring voice that spoke for the Court in *Duncan* v. *Louisiana*, [391 U. S. 145 (1968)]." *Id.*, at 709–714 (STEVENS, J., dissenting). Nor was it faithful to the history that JUSTICE SCALIA recounts today. Of course, Blackstone was concerned about judges exposed to the voice of the higher authority personified by the Crown, whereas today the concern is with the impact of popular opinion. It remains clear, however, that the constitutional right to be tried by a jury of one's peers provides "an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge." *Duncan* v. *Louisiana*, 391 U. S. 145, 156 (1968).

### III

The Court's conclusion that materiality is an element of the offenses defined in 18 U. S. C. §§ 1341, 1343, and 1344 is

obviously correct. In my dissent in *United States* v. *Wells,* 519 U. S. 482, 510 (1997), I pointed out that the vast majority of judges who had confronted the question had placed the same construction on the federal statute criminalizing false statements to federally insured banks, 18 U. S. C. § 1014. I repeat this point to remind the Congress that an amendment to § 1014 would both harmonize these sections and avoid the potential injustice created by the Court's decision in *Wells.*

JUSTICE SCALIA, with whom JUSTICE SOUTER and JUSTICE GINSBURG join, concurring in part and dissenting in part.

I join Parts I and III of the Court's opinion. I do not join Part II, however, and I dissent from the judgment of the Court, because I believe that depriving a criminal defendant of the right to have the jury determine his guilt of the crime charged—which necessarily means his commission of *every element* of the crime charged—can never be harmless.

## I

Article III, § 2, cl. 3, of the Constitution provides: "The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury . . . ." The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." When this Court deals with the content of this guarantee—the only one to appear in both the body of the Constitution and the Bill of Rights—it is operating upon the spinal column of American democracy. William Blackstone, the Framers' accepted authority on English law and the English Constitution, described the right to trial by jury in criminal prosecutions as "the grand bulwark of [the Englishman's] liberties . . . secured to him by the great charter." 4 W. Blackstone, Commentaries *349. One of the indictments of the Declaration of Independence against King George III was that he had "subject[ed] us to a Jurisdiction foreign to our Constitu-

tion, and unacknowledged by our Laws" in approving legislation "[f]or depriving us, in many Cases, of the Benefits of Trial by Jury." Alexander Hamilton wrote that "[t]he friends and adversaries of the plan of the convention, if they agree in nothing else, concur at least in the value they set upon the trial by jury: Or if there is any difference between them, it consists in this, the former regard it as a valuable safeguard to liberty, the latter represent it as the very palladium of free government." The Federalist No. 83, p. 426 (M. Beloff ed. 1987). The right to trial by jury in criminal cases was the only guarantee common to the 12 state constitutions that predated the Constitutional Convention, and it has appeared in the constitution of every State to enter the Union thereafter. Alschuler & Deiss, A Brief History of the Criminal Jury in the United States, 61 U. Chi. L. Rev. 867, 870, 875, n. 44 (1994). By comparison, the right to counsel—deprivation of which we have also held to be structural error—is a Johnny-come-lately: Defense counsel did not become a regular fixture of the criminal trial until 'the mid-1800's. See W. Beaney, Right to Counsel in American Courts 226 (1955).

The right to be tried by a jury in criminal cases obviously means the right to have a jury determine whether the defendant has been proved guilty of the crime charged. And since all crimes require proof of more than one element to establish guilt (involuntary manslaughter, for example, requires (1) the killing (2) of a human being (3) negligently), it follows that trial by jury means determination by a jury that *all elements* were proved. The Court does not contest this. It acknowledges that the right to trial by jury was denied in the present case, since one of the elements was not—despite the defendant's protestation—submitted to be passed upon by the jury. But even so, the Court lets the defendant's sentence stand, *because we judges can tell that he is unquestionably guilty.*

32

Even if we allowed (as we do not) other structural errors in criminal trials to be pronounced "harmless" by judges—a point I shall address in due course—it is obvious that we could not allow judges to validate *this* one. The constitutionally required step that was omitted here is distinctive, in that the basis for it is precisely that, absent voluntary waiver of the jury right, *the Constitution does not trust judges to make determinations of criminal guilt.* Perhaps the Court is so enamoured of judges in general, and federal judges in particular, that it forgets that they (we) are officers of the Government, and hence proper objects of that healthy suspicion of the power of government which possessed the Framers and is embodied in the Constitution. Who knows?— 20 years of appointments of federal judges by oppressive administrations might produce judges willing to enforce oppressive criminal laws, and to interpret criminal laws oppressively—at least in the view of the citizens in some vicinages where criminal prosecutions must be brought. And so the people reserved the function of determining criminal guilt *to themselves,* sitting as jurors. It is not within the power of us Justices to cancel that reservation—neither by permitting trial judges to determine the guilt of a defendant who has not waived the jury right, nor (when a trial judge has done so anyway) by reviewing the facts ourselves and pronouncing the defendant without-a-doubt guilty. The Court's decision today is the only instance I know of (or could conceive of) in which the remedy for a constitutional violation by a trial judge (making the determination of criminal guilt reserved to the jury) is a repetition of the same constitutional violation by the appellate court (making the determination of criminal guilt reserved to the jury).

## II

The Court's decision would be wrong even if we ignored the distinctive character of this constitutional violation. The Court reaffirms the rule that it would be structural

error (not susceptible of "harmless-error" analysis) to " 'viti-at[e] *all* the jury's findings.' " *Ante,* at 11 (quoting *Sullivan* v. *Louisiana,* 508 U. S. 275, 281 (1993)). A court cannot, no matter how clear the defendant's culpability, direct a guilty verdict. See *Carpenters* v. *United States,* 330 U. S. 395, 410 (1947); *Rose* v. *Clark,* 478 U. S. 570, 578 (1986); *Arizona* v. *Fulminante,* 499 U. S. 279, 294 (1991) (White, J., dissenting). The question that this raises is why, if denying the right to conviction by jury is structural error, taking *one* of the elements of the crime away from the jury should be treated differently from taking *all* of them away—since failure to prove one, no less than failure to prove all, utterly prevents conviction.

The Court never asks, much less answers, this question. Indeed, we do not know, when the Court's opinion is done, *how many* elements can be taken away from the jury with impunity, so long as appellate judges are persuaded that the defendant is surely guilty. What if, in the present case, besides keeping the materiality issue for itself, the District Court had also refused to instruct the jury to decide whether the defendant signed his tax return? See 26 U. S. C. § 7206(1). If Neder had never contested that element of the offense, and the record contained a copy of his signed return, would his conviction be automatically reversed in that situation but not in this one, even though he would be just as obviously guilty? We do not know. We know that all elements cannot be taken from the jury, and that one can. How many is too many (or perhaps what proportion is too high) remains to be determined by future improvisation. All we know for certain is that the number is somewhere between tuppence and 19 shillings 11, since the Court's only response to my assertion that there is no principled distinction between this case and a directed verdict is that "our course of constitutional adjudication has not been characterized by this 'in for a penny, in for a pound' approach." See *ante,* at 17, n. 2.

The underlying theme of the Court's opinion is that taking the element of materiality from the jury did not render Neder's trial unfair, because the judge certainly reached the "right" result. But the same could be said of a directed verdict against the defendant—which would be *per se* reversible *no matter how overwhelming the unfavorable evidence.* See *Rose* v. *Clark, supra,* at 578. The very premise of structural-error review is that even convictions reflecting the "right" result are reversed for the sake of protecting a basic right. For example, in *Tumey* v. *Ohio,* 273 U. S. 510 (1927), where we reversed the defendant's conviction because he had been tried before a biased judge, the State argued that "the evidence shows clearly that the defendant was guilty and that he was only fined $100, which was the minimum amount, and therefore that he can not complain of a lack of due process, either in his conviction or in the amount of the judgment." *Id.,* at 535. We rejected this argument out of hand, responding that *"[n]o matter what the evidence was against him,* he had the right to have an impartial judge." *Ibid.* (emphasis added). The amount of evidence against a defendant who has properly preserved his objection, while relevant to determining whether a given error was harmless, has nothing to do with determining whether the error is subject to harmless-error review in the first place.

The Court points out that in *Johnson* v. *United States,* 520 U. S. 461 (1997), we affirmed the petitioner's conviction even though the element of materiality had been withheld from the jury. But the defendant in that case, unlike the defendant here, had not *requested* a materiality instruction. In the context of such unobjected-to error, the mere deprivation of substantial rights "does not, without more," warrant reversal, *United States* v. *Olano,* 507 U. S. 725, 737 (1993), but the appellant must also show that the deprivation "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings," *Johnson, supra,* at 469 (quoting *Olano, supra,*

at 736) (internal quotation marks omitted). *Johnson* stands for the proposition that, just as the absolute right to trial by jury can be waived, so also the failure to object to its deprivation at the point where the deprivation can be remedied will preclude automatic reversal.[1]

Insofar as it applies to the jury-trial requirement, the structural-error rule does not exclude harmless-error analysis—though it is harmless-error analysis of a peculiar sort, looking not to whether the jury's verdict would have been the *same* without the error, but rather to whether the error did not *prevent* the jury's verdict. The failure of the court to instruct the jury properly—whether by omitting an element of the offense or by so misdescribing it that it is effectively removed from the jury's consideration—*can* be harmless, if the elements of guilt that the jury *did* find necessarily embraced the one omitted or misdescribed. This was clearly spelled out by our unanimous opinion in *Sullivan* v. *Louisiana, supra,* which said that harmless-error review "looks . . . to the basis on which 'the jury *actually rested* its verdict.'" 508 U. S., at 279 (quoting *Yates* v. *Evatt,* 500 U. S. 391, 404 (1991)). Where the facts *necessarily found* by the jury (and not those merely discerned by the appellate court) support the existence of the element omitted or misdescribed in the instruction, the omission or misdescription is harmless.[2] For there is then no "gap" *in the verdict* to

---

[1] Contrary to JUSTICE STEVENS' suggestion, *ante,* at 28 (opinion concurring in part and concurring in judgment), there is nothing "internally inconsistent" about believing that a procedural guarantee is fundamental while also believing that it must be asserted in a timely fashion. It is a universally acknowledged principle of law that one who sleeps on his rights—even fundamental rights—may lose them.

[2] JUSTICE STEVENS thinks that the jury findings as to the amounts that petitioner failed to report on his tax returns "necessarily included" a finding on materiality, since "'total income' is *obviously* 'information necessary to a determination of a taxpayer's income tax liability.'" *Ante,* at 26 (emphasis added). If that analysis were valid, we could simply dispense with submitting the materiality issue to the jury in *all* future tax

be filled by the factfinding of judges.  This formulation adequately explains the three cases, see *California* v. *Roy*, 519 U. S. 2, 6 (1996) (SCALIA, J., concurring); *Carella* v. *California*, 491 U. S. 263, 270–273 (1989) (SCALIA, J., concurring in judgment); *Pope* v. *Illinois*, 481 U. S. 497, 504 (1987) (SCALIA, J., concurring),[3] that the majority views as "dictat[ing] the answer" to the question before us today.  *Ante*, at 13.  In casting *Sullivan* aside, the majority does more than merely return to the state of confusion that existed in our prior cases; it throws open the gate for appellate courts to trample over the jury's function.

---

cases involving understatement of income; a finding of intentional understatement would be a finding of guilt—no matter how insignificant the understatement might be, and no matter whether it was offset by understatement of deductions as well.  But the right to a jury trial on all elements of the offense does not mean the right to a jury trial on only so many elements as are necessary in order logically to deduce the remainder.  The jury has the right to apply its own logic (or illogic) to its decision to convict or acquit.  At bottom, JUSTICE STEVENS "obviously" represents his judgment that *any* reasonable jury would *have* to think that the misstated amounts were material.  Cf. *ante*, at 16, n. 1.  It is, in other words, nothing more than a repackaging of the majority's approach, which allows a judge to determine what a jury "would have found" if asked.  And it offers none of the protection that JUSTICE STEVENS promises the jury will deliver "against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge."  *Ante*, at 29 (quoting *Duncan* v. *Louisiana*, 391 U. S. 145, 156 (1968)).

[3] The Court asserts that this "functional equivalent" test does not explain *Pope*, since "a juror in Rockford, Illinois, who found that the [allegedly obscene] material lacked value under community standards, would not necessarily have found that it did so under presumably broader and more tolerant national standards."  *Ante*, at 14.  If the jury had been instructed to measure the material by Rockford, Illinois, standards, I might agree.  It was instructed, however, to "judge whether the material was obscene by determining how it would be viewed by ordinary adults in the *whole State of Illinois*," 481 U. S., at 499 (emphasis added)—which includes, of course, the city of Chicago, that toddlin' town.  A finding of obscenity under that standard amounts to a finding of obscenity under a national ("reasonable person") standard.  See *id.*, at 504 (SCALIA, J., concurring).

Asserting that "[u]nder our cases, a constitutional error is either structural or it is not," *ante,* at 14, the Court criticizes the *Sullivan* test for importing a "case-by-case approach" into the structural-error determination. If that were true, it would seem a small price to pay for keeping the appellate function consistent with the Sixth Amendment. But in fact the Court overstates the cut-and-dried nature of identifying structural error. Some structural errors, like the complete absence of counsel or the denial of a public trial, are visible at first glance. Others, like deciding whether the trial judge was biased or whether there was racial discrimination in the grand jury selection, require a more fact-intensive inquiry. Deciding whether the jury made a finding "functionally equivalent" to the omitted or misdescribed element is similar to structural-error analysis of the latter sort.

## III

The Court points out that *all* forms of harmless-error review "infringe upon the jury's factfinding role and affect the jury's deliberative process in ways that are, strictly speaking, not readily calculable." *Ante,* at 18. In finding, for example, that the jury's verdict would not have been affected by the exclusion of evidence improperly admitted, or by the admission of evidence improperly excluded, a court is speculating on what the jury *would have found.* See, *e. g., Arizona* v. *Fulminante,* 499 U. S., at 296 (Would the verdict have been different if a coerced confession had not been introduced?); *Delaware* v. *Van Arsdall,* 475 U. S. 673, 684 (1986) (Would the verdict have been different if evidence had not been unconstitutionally barred from admission?). There is no difference, the Court asserts, in permitting a similar speculation here. *Ante,* at 18.

If this analysis were correct—if permitting speculation on whether a jury would have changed its verdict logically demands permitting speculation on what verdict a jury would have rendered—we ought to be able to uphold directed ver-

dicts in cases where the defendant's guilt is absolutely clear. In other words, the Court's analysis is simply a repudiation of the principle that depriving the criminal defendant of a jury verdict is *structural error*. *Sullivan* v. *Louisiana* clearly articulated the line between permissible and impermissible speculation that preserves the well-established structural character of the jury-trial right and places a principled and discernible limitation upon judicial intervention: "The inquiry . . . is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict *actually rendered* in *this* trial was surely unattributable to the error." 508 U. S., at 279 (emphasis added). Harmless-error review applies only when the jury *actually renders* a verdict—that is, when it has found the defendant guilty of all the elements of the crime.

The difference between speculation directed toward *confirming* the jury's verdict *(Sullivan)* and speculation directed toward *making a judgment that the jury has never made* (today's decision) is more than semantic. Consider, for example, the following scenarios. If I order for my wife in a restaurant, there is no sense in which the decision is hers, even if I am sure beyond a reasonable doubt about what she would have ordered. If, however, while she is away from the table, I advise the waiter to stay with an order she initially made, even though he informs me that there has been a change in the accompanying dish, one can still say that my wife placed the order—even if I am wrong about whether she would have changed her mind in light of the new information. Of course, I may predict correctly in both instances simply because I know my wife well. I doubt, however, that a low error rate would persuade my wife that my making a practice of the first was a good idea.

It is this sort of allocation of decisionmaking power that the *Sullivan* standard protects. The right to render the verdict in criminal prosecutions belongs exclusively to the jury; reviewing it belongs to the appellate court. "Confirm-

ing" speculation does not disturb that allocation, but "substituting" speculation does. Make no mistake about the shift in standard: Whereas *Sullivan* confined appellate courts to their proper role of reviewing *verdicts,* the Court today puts appellate courts in the business of reviewing the defendant's *guilt.* The Court does not—it *cannot*—reconcile this new approach with the proposition that denial of the jury-trial right is structural error.

\* \* \*

The recipe that has produced today's ruling consists of one part self-esteem, one part panic, and one part pragmatism. I have already commented upon the first ingredient: What could possibly be so bad about having *judges* decide that a jury would necessarily have found the defendant guilty? Nothing except the distrust of judges that underlies the jury-trial guarantee. As to the ingredient of panic: The Court is concerned that the *Sullivan* approach will invalidate convictions in innumerable cases where the defendant is obviously guilty. There is simply no basis for that concern. The *limited* harmless-error approach of *Sullivan* applies only when specific objection to the erroneous instruction has been made and rejected. In all other cases, the *Olano* plain-error rule governs, which is similar to the *ordinary* harmless-error analysis that the Court would apply. I doubt that the criminal cases in which instructions omit or misdescribe elements of the offense *over the objection of the defendant* are so numerous as to present a massive problem. (If they are, the problem of vagueness in our criminal laws, or of incompetence in our judges, makes the problem under discussion here seem insignificant by comparison.)

And as for the ingredient of pragmatism (if the defendant is unquestionably guilty, why go through the trouble of trying him again?), it suffices to quote Blackstone once again:

> "[H]owever *convenient* [intrusions on the jury right] may appear at first, (as, doubtless, all arbitrary powers, well executed, are the most *convenient,*) yet let it be

again remembered that delays and little inconveniences in the forms of justice are the price that all free nations must pay for their liberty in more substantial matters; that these inroads upon this sacred bulwark of the nation are fundamentally opposite to the spirit of our constitution; and that, though begun in trifles, the precedent may gradually increase and spread to the utter disuse of juries in questions of the most momentous concern." 4 Blackstone, Commentaries *350.

See also *Bollenbach* v. *United States,* 326 U. S. 607, 615 (1946). Formal requirements are often scorned when they stand in the way of expediency. This Court, however, has an obligation to take a longer view. I respectfully dissent.