IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 9, 2002

## STATE OF TENNESSEE v. HARRY JAMIESON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 0-01887-89    W. Otis Higgs, Judge**

---

**No. W2001-02449-CCA-R3-CD - Filed December 13, 2002**

---

The defendant was convicted by a Shelby County Criminal Court jury of one count of aggravated robbery, a Class B felony, and two counts of aggravated assault, Class C felonies, based on his participation in an armed robbery of a Memphis restaurant. He was sentenced by the trial court as a standard, Range I offender to concurrent terms of nine years for the aggravated robbery conviction and four years for each aggravated assault conviction, for an effective sentence of nine years in the Department of Correction. He was fined $500 for each conviction. On appeal, the defendant argues that the trial court erred by failing to instruct the jury on the lesser-included offenses of facilitation of aggravated robbery and aggravated assault and by improperly applying enhancement factors to enhance his sentences from the minimum in his range. We conclude that the trial court's failure to instruct the jury on the lesser-included offenses of facilitation constitutes reversible error under the circumstances of this case. Accordingly, we reverse the judgment of the trial court and remand the case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed and Remanded for a New Trial**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

A C Wharton, Jr., Shelby County Public Defender; W. Mark Ward, Assistant Shelby County Public Defender (on appeal); and Robert C. Felkner, Assistant Shelby County Public Defender (at trial), for the appellant, Harry Jamieson.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; William L. Gibbons, District Attorney General; and Betsy L. Carnesale, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

# FACTS

At approximately 9:30 p.m. on October 18, 1999, the defendant, Harry Jamieson, who was then 18 years old, accompanied his friend, Tyrell Arnold, into a Fazoli's restaurant located at 6466 Poplar Avenue in Memphis. Earlier that day, the defendant had agreed to commit a robbery with Arnold. In preparation, the two young men, accompanied by the defendant's girlfriend, Erin Carter, had gone to the Poplar Avenue apartment of seventeen-year-old Kevin Gonzalez, who lived across the street from the restaurant. Gonzalez supplied the men with a duffle bag and two guns: an inoperable "prop gun" that looked like a nine-millimeter weapon and a pellet gun. Gonzalez and Carter then waited in the apartment while the defendant and Arnold went across the street to the restaurant.

Inside the restaurant, the defendant and Arnold first placed their order at the front counter with sixteen-year-old restaurant employee Ashley Hodges and then sat in a booth near the front. Hodges recognized the defendant as a former student at her high school but did not identify herself as such to him, and he apparently did not recognize her. As the men waited for their food, the restaurant's manager, Stephanie Parks, went to their table to explain that the delay in their order was the result of their pizzas having to be cooked. When she introduced herself, the men engaged her in conversation, asking if she was the manager, and for other details about the operation of the business. Parks then left to go to the office, and the restaurant's four other employees began preparing to close. No other customers were present. At that point, Arnold went behind the front counter into the kitchen with his prop gun, pointed it at the employees, and told everyone to lie down on the floor. He then ordered Parks to get up and empty the contents of the three cash registers and the safe into the duffle bag.

During the robbery, the defendant, who did not display any weapon or speak to the employees, stayed on the customer side of the front counter. After the robbery, the two men ran together back to Gonzalez's apartment, where they counted the money and split the proceeds. They then went with Gonzalez and Carter to a pool hall where they drank beer and played pool. The next day, the defendant spent a portion of his share of the robbery proceeds buying shoes for himself and Carter.

The defendant and Arnold were subsequently charged with aggravated robbery and four counts of aggravated assault. Prior to trial, Arnold entered into a plea agreement with the State whereby he agreed to testify against the defendant in exchange for a nine-year sentence for aggravated robbery.[1] Arnold testified at the defendant's July 24-26, 2001, trial that he was currently 20 years old, and had been good friends with the defendant since the age of 15. According to Arnold's testimony, the robbery plan was hatched during the late afternoon and early evening hours of October 18, 1999, as the defendant was visiting at Arnold's house. Arnold said that he decided to commit a robbery because he needed money, and asked the defendant if he would commit the

---

[1]Although the record is not clear on this point, it appears from Arnold's testimony that he also pled guilty to several counts of aggravated assault in connection with the robbery.

robbery with him. Although the defendant was initially "kind of hesitant," after he had thought about it a short while, he said, "okay, let's do it." Arnold then telephoned Gonzalez to find out if he could supply a weapon, and Gonzalez said that he could. Next, Arnold, the defendant, and the defendant's girlfriend, Erin Carter, drove to Gonzalez's apartment, arriving at about 9:00 p.m. Gonzalez gave them a black prop gun for Arnold and a pellet gun for the defendant, which Arnold carried to the restaurant in a duffle bag.

Arnold said that he and the defendant discussed beforehand which role each would play in the robbery, with the defendant agreeing to act as lookout while Arnold went into the back of the restaurant to get the money. Accordingly, when the restaurant was empty of any customers besides themselves and the employees were all in the kitchen, Arnold told the defendant to watch the doors. Meanwhile, Arnold went into the kitchen, pointed his gun at the employees, and told everyone to get onto the floor. He then ordered Parks to get up and open the cash registers and the safe. During this time, the defendant held the duffle bag at the front door as he kept watch. However, realizing he needed somewhere to put the money, Arnold asked the defendant for the duffle bag, and the defendant came over and handed it to him.

Arnold estimated that he and the defendant obtained approximately $1300 or $1400 from the robbery.[2] He testified that he and the defendant split the money evenly and that he gave Gonzalez "a few dollars, a little bit of money." On cross-examination, Arnold acknowledged that the robbery was his idea and that the defendant never displayed his weapon. Arnold also acknowledged that he had three prior felony convictions.

Kevin Gonzalez's account of his role in the robbery substantially corroborated the testimony provided by Arnold, and included the following pertinent details: Arnold telephoned him on October 18, 1999, to tell him that he and the defendant had decided to commit a robbery and to ask if he would supply a weapon. He also spoke briefly with the defendant during that telephone conversation. The defendant wanted to know if it was going to be all right to do what they had planned, and he told him, "[Y]eah." Gonzalez gave Arnold a black prop gun to use in the robbery, and gave the defendant a brown pellet gun. He gave the pellet gun to the defendant because the defendant said that he did not want to go into the restaurant empty-handed, and asked him for a weapon.[3] After the robbery, he, Carter, Arnold, and the defendant sat in his bedroom and counted the money, and then went out together to drink and play pool. He thought he received about $50 of the robbery proceeds. He was charged with facilitation of robbery for his role in the crime, and his case was handled in juvenile court.[4]

---

[2]According to the restaurant's manager, approximately $1800 was taken in the robbery.

[3]Gonzalez testified that he later threw the two weapons into a dumpster behind his apartment building, where they were subsequently recovered by the police.

[4]There is no information in the record as to whether any charges were brought against the defendant's girlfriend, Erin Carter. At the sentencing hearing, the defendant's mother told the trial court that the defendant's fiancée was a law

(continued...)

Stephanie Parks testified that the defendant and Arnold came into the restaurant shortly before closing and ordered a pizza, which took longer than anticipated to make. When she went to their table to explain the delay, they asked her a number of questions, including whether she was the manager and what time the restaurant closed. She also noticed that they had their cups wrapped in napkins. When she came out of her office approximately ten or fifteen minutes before closing time, Arnold was standing in the kitchen with a gun drawn and yelling at everyone to"[g]et on the fucking floor." After she and the other employees were on the floor, he yelled at her, "Get up. Get up," tapping on her head and pulling on her shirt when she hesitated. When she stood, he motioned her to go to the front to empty the cash registers.

Parks testified that the defendant was standing on the other side of the counter beside the cash registers. The telephone started ringing and she told Arnold that it was probably her boss, who might think something was wrong if she did not answer the phone. Arnold then motioned for her to answer. At that point, however, the defendant "started shaking his head no, making it apparent that he didn't want [her] to answer the phone." The defendant and Arnold said something to each other that she could not hear, and Arnold then told her, "Never mind. Don't answer the fucking phone. Just get the money." Parks said that the defendant stood in front of her, watching her take the cash out of the drawer. The defendant did not speak, but it was obvious to Parks that he was nonverbally "communicating what [Arnold] should be doing next."

Parks testified that the defendant followed to stand in front of her when she moved to empty the second cash register. A customer pulled up to the drive-through window, and Arnold moved to the front of the counter to stand beside the defendant. When the customer had gone, Arnold went with her to the back of the restaurant to get the money from the safe, while the defendant stayed in front of the cash registers. After the robbery, the two men left the restaurant together. Parks testified that she felt very afraid of the defendant during the robbery, and believed him to be as much of a threat as Arnold. She acknowledged on cross-examination, however, that she never saw the defendant with a gun.

Ashley Hodges testified that she had just turned sixteen at the time of the robbery. She took Arnold's and the defendant's order when they came into the restaurant, and recognized the defendant as a former high school classmate. He gave no indication that he recognized her, however. She was headed toward the front door preparing to leave when Arnold came into the back of the restaurant with a gun and told all of the employees to get on the floor. She stayed on the floor, shaking and crying, for the duration of the robbery and did not see the defendant.

Two other employees who were present at the time of the robbery, Rebecca Jackson and Amanda Murray, each testified at the defendant's trial. Jackson said that she was just about to go

---

4(...continued)
student at the University of Memphis. She did not mention the fiancée's name. However, the trial court assumed that the defendant's fiancée was his former girlfriend, Erin Carter, and was understandably appalled at the thought of her as a law student.

out the back kitchen door of the restaurant when she heard someone tell the other employees to get "on the 'F'g' floor and don't move." She got underneath the sink and stayed there until she heard Parks and Arnold go to the front of the restaurant, at which point she ran out the back door to summon help. She did not see either Arnold or the defendant. Murray testified that she had just come out of the freezer after taking inventory when Arnold stepped back into the kitchen, put a gun in her face, and ordered everyone to "[g]et down on the fucking floor." She and the three other employees who were present in the area, Tony York, Ashley Hodges, and Stephanie Parks, all got down onto the floor. Arnold then told Parks to open the cash drawers and the safe and followed her around while she did so, while Murray, York, and Hodges remained lying on the floor. Murray testified that she did not see the defendant, but that Hodges had made her aware that he was there, telling her that she was scared because she recognized him from her high school.

Sergeant William Merritt of the Memphis Police Department took the defendant's statement on October 21, 1999. After he read the statement for the jury, it was introduced as an exhibit. The defendant admitted in his statement that he had participated in the robbery and received approximately $600 of the proceeds. He claimed, however, that he had been on his way to the bathroom when Arnold pulled the gun from his pocket and started yelling at the employees to get on the floor. Asked to describe in his own words what had happened, the defendant stated:

> We were at Kevin Gonzalez's apartment and we were hungry so myself and [Arnold] walked to Fazoli's. I got a piece of cheesecake and he got a piece of pizza and we sat down and ate. We got up to leave and I was walking toward the bathroom when [Arnold] pulled the gun from his pocket and started yelling for everyone to get on the ground. [Arnold] had the manager empty the cash registers and the safe. Then we left. We went back to Kevin Gonzalez's apartment. From there, [Arnold] divided up the money and told me I should take part of it. Realizing part of the financial burdens I had, I took it. [Carter] and I then went home.

In his statement, the defendant said he had not seen Arnold armed with the handgun prior to the robbery and that he had been "in shock," pacing back and forth in front of the counter and shaking his head no, during the time that Arnold carried out the robbery. He stated that he had bought shoes for himself and Carter with a portion of his share of the robbery proceeds, and spent $100 to pay Carter's car note. He said that the remainder of the money was in a pillowcase in his closet.

The State's final witness was Sergeant Michael Williams of the Memphis Police Department, who testified that he conducted a search of the defendant's bedroom on October 21, 1999, uncovering $253 in cash inside a pillowcase in the defendant's closet. After the trial court directed judgments of acquittal on the two counts of the indictment charging the defendant with the aggravated assault of Tony York and Rebecca Jackson, the trial continued with the presentation of the defendant's proof.

The defendant testified that he was 20 years old, and had known Arnold for about five years. He described Arnold as an individual who needed a friend, and whom he had tried to help. On the evening of October 18, 1999, Arnold called and asked him to take him to Gonzalez's house. When he arrived to pick him up, Arnold told him that he had gotten into some trouble over a credit card and wanted the defendant to participate with him in a robbery so that he could pay his attorney's fees. The defendant told Arnold that he was "nuts." He testified that Arnold "kept talking and kept talking," and he told Arnold "no, three or four more times," until he finally said that he would help him. They then drove with Carter to Gonzalez's apartment, where they sat down and watched television until Arnold suggested they go get something to eat. At that point, he and Arnold left the apartment together on foot and went to the Fazoli's restaurant on Poplar Avenue, where they ordered and then sat down in the restaurant to eat. The defendant testified that Arnold had talked earlier about how easy the Fazoli's would be to rob; and he mentioned the robbery again just before they left the apartment, but he "didn't really give any specifics about it." According to the defendant, he was under the impression that he and Arnold were going to the restaurant just to "case" the place, not to rob it.

The defendant acknowledged he had seen Arnold place the black gun in the duffle bag before they left the apartment, and Arnold had told him there were two guns in the bag. He said he noticed Arnold placing napkins on everything in the restaurant and thought that was strange when Arnold told him that it was to prevent leaving fingerprints. The defendant was still under the impression at that point that they were there just to look around. However, during the meal, Arnold suggested that they go ahead and commit the robbery right then, becoming increasingly aggressive in his talk and scaring the defendant. The defendant testified that he told Arnold, "This is crazy. I can't do this. I want out," and got up to leave, but Arnold pulled the gun and he "just froze." The defendant explained why he remained in the restaurant:

> When he pulled the gun, I didn't know what to do. I wanted to scream. I wanted to run. Neither one worked. Everything just happened so quickly, and the next thing I knew he was running past me, and he slapped me in the arm, and he said run, and I heard, "Run," and I ran because I was scared, and when we got back to the apartment, he had the gun in his pants, and he said, "You keep your fucking mouth shut or you'll be sorry."

The defendant testified that he never touched the pellet gun while in the restaurant. He denied that he communicated nonverbally with Arnold during the robbery, followed Parks from register to register, or issued any instruction that Parks not answer the telephone. The defendant said he was shaking his head no during the robbery, and that he might have said Arnold's name a couple of times because he could not believe what was happening. He stated that he left Arnold and Gonzalez alone in the bedroom during part of the time they were counting the money while he told Carter what had happened and the threat Arnold had made against him. He said that Carter was upset and panicky, and they both wanted to leave, but Arnold wanted them to go play pool. The defendant testified that he agreed to go with them because he was afraid of Arnold and did not know

-6-

what he was capable of doing. Before leaving the apartment, Arnold put a bunch of one-dollar bills in a pillowcase, handed it to him, and reminded him to keep his mouth shut. He accepted the money and spent some of it the next day.

The defendant's only explanation for his behavior was to say that he had been 18 and stupid. Asked what he had been thinking, he said, "I have no idea. [Arnold] had a very intoxicating personality, and for a moment, I got caught up in it, and I thought I had the control over the situation to walk out and it was too late. He made the decision for me." The defendant said that there were many things he could have done differently when Arnold pulled the gun, but at the time he had been unable to react, like a "deer caught in headlights."

On cross-examination, the defendant admitted he had known when they left the apartment that Arnold had not only a gun but also a bag in which to carry the robbery proceeds back to the apartment. He also admitted that Gonzalez's testimony that he had asked for a gun for himself was true. He testified, however, that his gun had stayed in the duffle bag and that he had never had possession of the bag.

## ANALYSIS

### I. Failure to Instruct on Facilitation of Indicted Offenses

The defendant contends that the trial court committed reversible error by failing to instruct the jury on facilitation of the charged offenses. He argues that the evidence warranted an instruction on facilitation of aggravated robbery and aggravated assault, and that the trial court's failure to instruct on the lesser-included offenses was prejudicial to the outcome of his trial. The State concedes that the trial court erred in failing to instruct on facilitation but contends that, under State v. Williams, 977 S.W.2d 101 (Tenn. 1998), the error was harmless beyond a reasonable doubt because the jury convicted the defendant of the indicted offenses to the exclusion of the immediately lesser charged offenses of robbery and assault. We review this issue *de novo*, with no presumption of correctness to the trial court's determination as to which lesser-included offenses to charge. See State v. Bowles, 52 S.W.3d 69, 74 (Tenn. 2001).

When an issue is raised regarding the trial court's failure to instruct on a lesser-included offense, we must determine: (1) whether the offense is a lesser-included offense under the test adopted in State v. Burns, 6 S.W.3d 453 (Tenn. 1999); (2) whether the evidence supports an instruction on the lesser-included offense; and (3) whether the failure to instruct on the lesser-included offense constitutes harmless error. State v. Allen, 69 S.W.3d 181, 187 (Tenn. 2002). Part (c) of the Burns test provides that an offense is a lesser-included offense if it consists of "facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b)." Burns, 6 S.W.3d at 466-67. Therefore, facilitation of aggravated robbery and facilitation of aggravated assault are lesser-included offenses, respectively, of aggravated robbery and aggravated assault under part (c) of the test. See Allen, 69 S.W.3d at 187.

The next step of our inquiry is an examination of the evidence to determine if an instruction on facilitation of the crimes was warranted. Id. This involves a two-step process: first, determining whether any evidence exists that reasonable minds could accept in support of the lesser-included offense; and second, determining if the evidence, viewed in the light most favorable to the existence of the lesser-included offense, is legally sufficient to support a conviction for the lesser-included offense. Id. (quoting Burns, 6 S.W.3d at 469). In other words, we must view the evidence liberally, in a light most favorable to the existence of the lesser-included offense, without making any judgments on the credibility of the evidence. State v. Ely, 48 S.W.3d 710, 722 (Tenn. 2001); Burns, 6 S.W.3d at 469. Furthermore, it is the evidence, and not the theory of the parties, to which we look to determine whether an instruction on a lesser-included offense was warranted. Allen, 69 S.W.3d at 188.

The defendant was charged with aggravated robbery and aggravated assault under a theory of criminal responsibility for Arnold's actions. A person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2) (1997). A conviction for facilitation, on the other hand, requires proof that a person, "knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2)," "knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a) (1997). Thus, to find the defendant guilty of facilitation of aggravated robbery and aggravated assault beyond a reasonable doubt, the jury would have to conclude that the defendant, although not acting with the intent to promote the robbery or assaults or to benefit in the proceeds or results, nevertheless furnished substantial assistance to Arnold knowing that Arnold intended to commit the crimes. The State concedes the evidence in this case was sufficient to warrant an instruction on facilitation. We agree that there was evidence that reasonable minds could accept in support of facilitation of aggravated robbery and aggravated assault, and that such evidence, viewed in the light most favorable to the existence of the lesser-included offenses, was legally sufficient to support convictions for facilitation of the crimes.

In a recent case with similar facts, State v. Allen, 69 S.W.3d 181(Tenn. 2002),[5] our supreme court addressed the issue of whether a defendant who was charged with aggravated robbery under a theory of criminal responsibility was entitled to an instruction on facilitation of robbery as a lesser-included offense. The defendant in Allen stood silently in the doorway of a convenience store while his accomplice robbed the clerk at gunpoint. Id. at 188. The defendant did not speak to the victim, took no property from her, and did not display a weapon. Id. After the robbery, he fled the scene with his accomplice. However, there was no evidence that he shared in the robbery proceeds. Id. After reviewing the evidence against the defendant, our supreme court concluded that it was sufficient for a jury to have reasonably concluded that the defendant "did not share the intent of his accomplice even though he knowingly furnished substantial assistance by blocking the door." Id.

_____

[5]Since the opinion in Allen was released after the trial resulting in the present appeal, the trial court did not have the benefit of the Allen holding.

Substantially more evidence was presented in the case at bar to show that the defendant shared in Arnold's intent to commit the robbery. Nonetheless, viewed in the light most favorable to the existence of the lesser-included offenses, we conclude that the evidence warranted an instruction on facilitation. Although admitting he had agreed to commit a robbery with Arnold, the defendant claimed that his purpose in going to the restaurant the night of the robbery was to "case" the place for a future robbery. According to his testimony, Arnold did not change the plan until sometime during their meal, when he suddenly began urging that they commit the robbery right then. The defendant said that he told Arnold he wanted no part of it and got up to leave, only to freeze like a "deer caught in headlights" after Arnold pulled his gun and began the robbery. He explained the alleged "nonverbal communication" that Stephanie Parks witnessed by testifying that he was in shock during the robbery, nervously pacing back and forth in front of the cash registers and shaking his head no to Arnold because he could not believe what Arnold was doing. He said that he went to play pool with Arnold after the robbery because he felt threatened by him, and that he took the money because he was young and stupid. The testimony of his accomplices, the fact that he requested a gun to take to the restaurant, and his acceptance of a share of the robbery proceeds, make the defendant's claim that he lacked the intent to participate in the robbery somewhat incredible. However, we are required to view the evidence in the light most favorable to the existence of the lesser-included offenses without making judgments on the credibility of the evidence. Viewed in this liberal light, we conclude that the evidence warranted an instruction on the lesser-included offenses of facilitation.

The last step of our inquiry is to determine if the trial court's failure to instruct on the lesser-included offenses was harmless beyond a reasonable doubt. See State v. Ely, 48 S.W.3d 710, 725 (Tenn. 2001). The State contends that it was, relying on State v. Williams, 977 S.W.2d 101 (Tenn. 1998), to argue that by finding the defendant guilty of aggravated robbery and aggravated assault to the exclusion of robbery and assault, the immediately lesser-included offenses with which it was charged, the jury necessarily rejected all other lesser-included offenses. However, facilitation of aggravated robbery is a Class C felony, as is robbery. Compare Tenn. Code Ann. §§ 39-11-403(b) and 39-13-402(b) with Tenn. Code Ann. § 39-13-401(b). Moreover, facilitation of aggravated assault is a Class D felony, whereas assault is a Class A misdemeanor. Compare Tenn. Code Ann. §§ 39-11-403(b) and 39-13-102(d) with Tenn. Code Ann. § 39-13-101(b). Thus, the jury's convictions in this case did not involve the rejection of intermediate lesser-included offenses.

Furthermore, even had the jury rejected immediately lesser-included offenses to convict of the indicted offenses, its verdict in this case would not "'necessarily include[] a finding' on the omitted element," Allen, 69 S.W.3d at 190 (quoting Neder v. United States, 527 U.S. 1, 26, 119 S. Ct. 1827, 1842, 144 L. Ed. 2d 35 (1999)), since "facilitation is a separate and distinct theory of liability from that of a principal offender or someone who is criminally responsible for the conduct of another." State v. Takeita M. Locke, ___S.W.3d ___ , slip op. at 7 (Tenn. 2002); see also State v. Daniel Wade Wilson, No. E2000-01885-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 587, at *37 (Tenn. Crim. App. Aug. 2, 2001), perm. to appeal denied (Tenn. Mar. 11, 2002) ("[F]acilitation of a crime involves an entirely different analysis. Facilitation addresses the Defendant's role as a facilitator, rather than a principal actor." ). Therefore, this case is not analogous to the situation in

Williams, in which the jury's rejection of an immediately lesser-included offense made the failure to instruct on more remote lesser-included offenses harmless error.

The State also argues that the defense theory at trial renders the trial court's failure to instruct on facilitation harmless beyond a reasonable doubt. The State asserts that by rejecting the defendant's claim that he acted under duress,[6] the jury necessarily rejected a finding that the defendant lacked the intent to commit the robbery. In a recent case, our supreme court explained that whereas a lesser-included offense must be instructed "when there is evidence sufficient such that a jury <u>could</u> convict on that lesser-included offense," when "deciding whether it was harmless beyond a reasonable doubt not to charge a lesser-included offense, the reviewing court must determine whether a reasonable jury <u>would</u> have convicted the defendant of the lesser-included offense instead of the charged offense." <u>State v. Linnell Richmond</u>, ___S.W.3d___, slip op. at 14 (Tenn. 2002) (emphasis in original). Thus, "when a reviewing court is determining whether a lesser-included instruction error was harmless beyond a reasonable doubt, the 'reviewing court should conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of the defense, and the verdict returned by the jury.'" <u>Locke</u>, ___S.W.3d at ___, slip op. at 8 (quoting <u>Allen</u>, 69 S.W.3d at 191).

Here, although the jury rejected that the defendant acted in duress, it was not given the opportunity to decide whether he facilitated the crimes. Because of the defendant's testimony and the statement he gave the police, the evidence of his intent to participate in the robbery was controverted. The jury could, therefore, while rejecting that he acted in duress, have reasonably found that the defendant lacked the intent to participate with Arnold in the robbery, but provided substantial assistance once the robbery began by watching the door and handing Arnold the duffle bag when he requested it. Although the issue is close, after reviewing the entire evidence in the case, including the theory of defense and the verdicts reached by the jury, we are unable to conclude beyond a reasonable doubt that the trial court's failure to instruct the jury on facilitation of the indicted offenses did not affect the outcome of the trial. Therefore, we reverse the judgments of conviction and remand for a new trial. However, because of the possibility of further review, and to assist the trial court in sentencing if the defendant is again convicted upon retrial, we will review his challenge to the trial court's sentencing determinations.

## II. Sentencing

The defendant contends that the trial court erroneously applied several enhancement factors to enhance his sentences from the minimum in his range. At the conclusion of the sentencing hearing, the trial court applied the following enhancement factors:

> (3)    The offense involved more than one (1) victim;

---

[6]The trial court instructed the jury on the defense of duress.

(9) The defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense;

(10) The defendant had no hesitation about committing a crime when the risk to human life was high;

(16) The crime was committed under circumstances when the potential for bodily injury to a victim was great.

Tenn. Code Ann. § 40-35-114 (3), (9), (10), (16) (Supp. 2001). Based on its finding that the above enhancement factors applied, and that there were no applicable factors in mitigation, the trial court enhanced the defendant's sentence for aggravated robbery from the minimum of eight years to nine years, and his sentences for aggravated assault from the minimum of three years to four years, ordering that the sentences be served concurrently in the Department of Correction.

The defendant argues that the trial court misapplied all four enhancement factors, and that he should have received the minimum sentences for the offenses. The State concedes the trial court misapplied enhancement factors (3), (9), and (16), but contends that enhancement factor (10) was appropriately applied based on the circumstances of the case and justified the enhanced sentences imposed. We agree with the State.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; State v. Scott, 735 S.W.2d 825, 829 (Tenn. Crim. App. 1987).

The party challenging the sentences imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169. In this case, the defendant has the burden of illustrating the sentences imposed by the trial court is erroneous.

We agree that enhancement factors (3), (9), and (16) were inappropriately applied in this case. Enhancement factor (3), the offense involved more than one victim, cannot be applied when,

as here, the defendant was convicted of committing aggravated robbery and aggravated assaults against specific, named victims. See State v. Imfeld, 70 S.W.3d 698, 706 (Tenn. 2002). Enhancement factor (9), the defendant employed a firearm in the commission of the offense, is not applicable because the defendant's convictions for aggravated robbery and aggravated assault were based on the use of a firearm in the commission of the crimes, thereby making enhancement factor (9) an essential element of the offenses. See Tenn. Code Ann. § 40-35-114(9) (Supp. 2001); State v. Nix, 922 S.W.2d 894, 903-04 (Tenn. Crim. App. 1995). Finally, our supreme court has held that enhancement factor (16), the crime was committed under circumstances in which the potential of bodily injury to a victim is great, applies only when the defendant creates a great risk of injury to a victim. See Imfeld, 70 S.W.3d at 706-07. However, in this case, the proof of great risk of injury to the victims was established by Arnold's use of a gun, an essential element in both the aggravated robbery and aggravated assault convictions. Therefore, the trial court should not have applied enhancement factors (3), (9), or (16) to enhance the defendant's sentences.

We conclude, however, that enhancement factor (10), the defendant had no hesitation about committing a crime when the risk to human life was high, was appropriately applied under the circumstances of this case. Enhancement factor (10) is the appropriate factor to be applied when there is a risk to the life of someone other than the victim. See Imfeld, 70 S.W.3d at 707. The evidence was that there were five employees in the restaurant at the time the defendant and Arnold committed the aggravated robbery of Parks and aggravated assaults of Murray and Hodges. Enhancement factor (10) was, therefore, appropriately applied based on the risk to other individuals present in the restaurant at the time the crimes were committed. In sum, we conclude that the trial court misapplied enhancement factors (3), (9), and (16), but appropriately applied enhancement factor (10) which justified the enhanced sentences.

## CONCLUSION

Based on the foregoing authorities and reasoning, we reverse the judgment of the trial court and remand the case for a new trial.

_____
ALAN E. GLENN, JUDGE