[Cite as *State v. Ahmad*, 2012-Ohio-3489.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                          :

    Plaintiff-Appellee                         :            C.A. CASE NO.    24563

v.                                                              :            T.C. NO.    09CR3532

SHAFIK AHMAD                                       :            (Criminal appeal from
                                                                       Common Pleas Court)
    Defendant-Appellant                      :

                                                                :

· · · · · · · · · ·

**O P I N I O N**

Rendered on the ____3rd____ day of ____August____, 2012.

· · · · · · · · · ·

CARLEY J. INGRAM, Atty. Reg. No. 0020084, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

JAY A. ADAMS, Atty. Reg. No. 0072135, 424 Patterson Road, Dayton, Ohio 45419
    Attorney for Defendant-Appellant

· · · · · · · · · ·

FROELICH, J.

{¶ 1} Shafik Ahmad was convicted after a jury trial of conspiracy to commit murder; the trial court sentenced him to seven years in prison. Ahmad appeals from his

conviction, claiming that the trial court erred in instructing the jury, that his conviction was based on insufficient evidence and was against the manifest weight of the evidence, and that the trial court erred in allowing evidence of his prior conduct. For the following reasons, the trial court's judgment will be affirmed.

## I. Sufficiency and Manifest Weight of the Evidence

{¶ 2} We begin with Ahmad's second and third assignments of error, which claim that Ahmad's conviction was based on insufficient evidence (third assignment) and against the manifest weight of the evidence (second assignment).

{¶ 3} An argument based on the sufficiency of the evidence challenges whether the State presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 4} In contrast, "a weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12. When evaluating whether a conviction is contrary to the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in

resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983); *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 44.

**{¶ 5}** Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). However, we may determine which of several competing inferences suggested by the evidence should be preferred. *Id.*

**{¶ 6}** The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

**{¶ 7}** The evidence, when construed in the light most favorable to the State, established the following facts:

**{¶ 8}** Shafik Ahmad was married to Kristin Hornsby between 1996 and 2005, and they have one child together. After their divorce was finalized, Ahmad and Hornsby continued to have bitter post-divorce disputes, primarily regarding the custody and upbringing of their son. In 2006, Kristin Hornsby remarried, and she moved with her son and husband to Batavia, Ohio. Ahmad later married Tiffany Macy.

**{¶ 9}** Ahmad was a physician who operated a family practice called Family

Physicians of Huber Heights. During the summer of 2009, Dr. Ahmad had an appointment with Josh Ryan, whose mother, Lisa Hartless, worked for Ahmad. According to Ryan, Ahmad told him during the appointment about another patient who was worried that he (the other patient) would be killed by a biker gang with which he had associated, and Ahmad asked Ryan how the gang would likely "handle this situation;" Ahmad told Ryan that he (Ahmad) had a situation that needed to be handled in a similar way. When Ryan asked what Ahmad was talking about, Ahmad told Ryan about his ex-wife, Kristin Hornsby, and the disputes they were having. Ryan asked Ahmad, "What are you saying, you want to have her killed?" Ahmad told Ryan, "Yes." Ahmad indicated to Ryan that his (Ryan's) mother had said that Ryan had been involved in a street gang when he was younger, and Ahmad thought he might still have connections. Ryan told Ahmad that he did not associate with those people anymore, but Ahmad asked Ryan to let him know if Ryan came across someone who could have his ex-wife killed. When Ryan was leaving the office, Ahmad asked Ryan to "remember what we talked about." Ryan understood that Ahmad wanted him to find someone to kill Hornsby.

{¶ 10} Ryan testified that he did not want to help Ahmad find someone to kill Hornsby, but he was concerned that his mother would lose her employment with Ahmad if he did not cooperate. He was also concerned about his step-father, James Hartless, who had serious medical conditions and received free medical care and medication from Dr. Ahmad. Ryan stated that he did not search for a person to kill Ahmad's ex-wife, but he led Ahmad to believe that he was doing so.

{¶ 11} During another medical appointment, Ahmad asked Ryan if there was

anything else they could do regarding his ex-wife. Ahmad stated that he was thinking that they could get incriminating pictures of Hornsby. Ryan asked Ahmad if he had considered hiring a private investigator; Ahmad responded that a private investigator would not "let him use the pictures for what he wanted to use them for."

{¶ 12}   Ryan had several subsequent appointments with Ahmad and, each time, Ahmad asked Ryan whether he had found anyone yet. Several times, Ahmad expressed to Ryan,"I wish she was just gone" and "I wish we could just find somebody to kill her."

{¶ 13}   In October 2009, Ahmad called Ryan to his office. He told Ryan, "I'm losing my business because of this bitch." Ahmad stated that he had a court date on October 26, and he needed something to happen soon. Ahmad told Ryan that, if he had to fire some of his employees, Ryan's mother would be one of the first to go. Ahmad also emphasized that the Hartlesses could not afford Mr. Hartless's medications. Ahmad told Ryan, "Help me, help you." Ryan told Ahmad that he did not think anyone was taking him (Ryan) seriously, and Ahmad asked, "If we spread some money around, do you think that would make them take it more serous?"

{¶ 14}   Before Ryan left the office that day, Ahmad spoke with Ryan about landscaping he wanted Ryan to do at the office. Ahmad gave Ryan $2,400, which Ryan initially believed was for the landscaping. Ryan went home and researched the things he needed for the landscaping work, and he called Ahmad to tell him that he did not think the work would cost $2,400. Ahmad was pleased. When Ryan started to describe the landscaping costs, Ahmad indicated to Ryan that he had not been referring to the landscaping. Ryan testified that he then realized that Ahmad was "talking about the whole

situation with his ex-wife * * * [f]inding somebody to kill her, finding somebody to take pictures of her, whatever it may be." Ryan returned $2,000 of the $2,400 to Ahmad about ten days later.

{¶ 15} On another day, Ahmad called Ryan to the office and told him to go to an address where a biker gang was located and tell them that Ahmad had some business for them. Ryan drove to the location, but left without attempting to talk to anyone.

{¶ 16} On October 20, 2009, Ahmad called Ryan and asked him to come to the office on the following day to discuss the idea of planting illegal drugs on Hornsby. Ryan did not go to the appointment on October 21. Ahmad contacted Ryan and told him that he wanted to meet with Ryan after work.

{¶ 17} Between 4:30 and 5:00 p.m. (prior to Ryan's hearing again from Ahmad), detectives from the Montgomery County Sheriff's Office went to Ryan's home and asked him to come to the sheriff's office. Ryan spoke with Detective Daugherty and told the detective that he knew he was at the sheriff's office because "there's a doctor that's been trying to get me to find somebody to have his ex-wife killed." Ryan informed the detective about the situation and agreed to wear a wire in a meeting with Ahmad later that day. Ryan told the detective that Ahmad had probably tried to call him, and when Ryan and the detective went to Ryan's home, they saw that Ryan had missed several calls from Ahmad.

{¶ 18} Ryan called Ahmad and, in a recorded conversation, made plans to meet. The detectives gave Ryan a wire and dropped him off at the Neo Limits, where it was arranged that Ahmad would pick up Ryan. After Ryan got into Ahmad's car, Ryan told Ahmad that he had found someone to kill Hornsby for $2,000. Ryan told Ahmad that he

would give the person $1,000 now and $1,000 after the death was reported on the news. Ahmad initially stated, "That's good," but later asked whether there was "nothing in between" that could be done. Ryan responded that his "dude" would kill Hornsby, but he "ain't gonna fuck around and go up there and * * * piddle paddle around to try to put some drugs in her car." Ryan also said that, "[t]o do all that other shit, that's where you get * * * pricey." Ryan told Ahmad that he would need Hornsby's address and a photo. After discussing how the hit would be done, Ahmad indicated that he would prefer the killer to follow Hornsby from his son's school after the child was dropped off. Ryan told Ahmad to go home and write down the address of the school, get it to him the next day, and the hit would be done on that Friday. The meeting concluded with "done deal." Ahmad gave Ryan an envelope with $2,000 in cash; after the meeting with Ahmad, Ryan gave that money to the detectives.

{¶ 19} Ryan called Ahmad later that night, saying that he needed to have the photo and address that night. Ahmad stated he would have to look for the pictures and would be back in touch. Ahmad called back later that night and told Ryan that he had pictures and the address. The two arranged to meet. Detectives went to the location in place of Ryan, and Ahmad was arrested.

{¶ 20} During defense counsel's cross-examination of Ryan, Ryan testified that "everything was still on the table" on October 21, including killing Hornsby. Ryan denied that he had to cooperate with the detectives in order to avoid being charged with a crime and that he was scared that he would be charged. Ryan stated that, when he talked to his stepfather about his interactions with the sheriff's office, he told him about the murder plot.

Ryan stated that he tried to talk to his mother about the situation prior to Ahmad's arrest, but she did not want to hear about it.

{¶ 21} Other witnesses by the State corroborated portions of Ryan's testimony. Tiffany Macy-Ahmad testified that she worked as the officer manager/bookkeeper for her husband's office, and that she printed a check for $2,000, made out to cash, on October 20, 2009. Ahmad had signed and endorsed the check. A National City Bank employee testified that Ahmad cashed the check on October 21.

{¶ 22} Macy-Ahmad further testified that she overheard her husband talking with Ryan around 6:30 p.m. on October 21. After the call, Ahmad left the house and returned 20 minutes later. Later that evening, Macy-Ahmad heard Ahmad talking on the phone with Ryan about photos. After the conversation, Ahmad gave Macy-Ahmad family photographs that included Hornsby and had Macy-Ahmad cut out the individuals other than Hornsby. Macy-Ahmad then returned the photos to Ahmad. Macy-Ahmad also wrote the location of Ahmad's son's school on a sheet of paper. The photos and address were recovered from Ahmad when he was arrested.

{¶ 23} Laura Macy, Ahmad's mother-in-law, testified that she spoke with Ahmad during the evening of October 20, 2009. She described Ahmad as "stressed beyond stressed." When she talked to him about the upcoming custody hearing, Ahmad stated to her that "he might have a solution to that."

{¶ 24} Detective Daugherty testified that Ryan informed the officers about Ahmad's plot to have Hornsby murdered and that Ryan agreed to wear a wire during a meeting with Ahmad. The State also presented cell phone records showing numerous

phone calls between Ahmad and Ryan.

{¶ 25} Hornsby testified that she contacted the Clermont County Sheriff's Office in May 2009 regarding a telephone conversation that she had with Ahmad, during which Ahmad threatened to kill her "if I have" to in order to get his son. Hornsby stated that Ahmad moved for permanent custody of their son in May 2009 and a hearing was scheduled for October 26. A psychological evaluation had been performed, and the evaluator recommended that custody remain with Hornsby.

{¶ 26} As a rebuttal witness, Jason Jones, a former police officer, testified that he became friends with Ahmad while he was Ahmad's patient in 2007. During their friendship, Ahmad told Jones that Hornsby "was giving him trouble with money and with custody with his child" and Ahmad spoke several times about finding someone to kill her. Ahmad hinted that he was devising a plan, and during one discussion, Ahmad tried to show Jones where Hornsby lived. After Jones and Ahmad became business associates for Jones's business, their friendship deteriorated.

{¶ 27} R.C. 2923.01(A), the conspiracy statute under which Ahmad was charged, provides that "[n]o person, with purpose to commit or to promote or facilitate the commission of * * * murder shall * * * (1) [w]ith another person or persons, plan or aid in planning the commission of [murder]." R.C. 2923.01(B) further provides:

> No person shall be convicted of conspiracy unless a substantial overt act in
> furtherance of the conspiracy is alleged and proved to have been done by the
> accused or a person with whom the accused conspired, subsequent to the
> accused's entrance into the conspiracy. For purposes of this section, an overt

act is substantial when it is of a character that manifests a purpose on the part of the actor that the object of the conspiracy should be completed.

{¶ 28} Ahmad claims that the State failed to prove beyond a reasonable doubt that he (1) had a purpose to commit, promote, or facilitate the murder of Hornsby, (2) that he planned or aided in planning the murder of Hornsby, and (3) that he undertook a substantial overt act to further the conspiracy to commit murder against Hornsby. He asserts that the evidence demonstrated that his intentions toward Hornsby were "unclear." He states: "It is apparent from the testimony adduced at trial that Ahmad's purpose and intentions had changed by the time he had the meeting with Ryan on October 21, 2009. By this point in time, Ahmad either wanted to find someone to plant drugs on his ex-wife or wanted to find someone to take incriminating pictures of his ex-wife so he could use this evidence against her in their pending custody litigation."

{¶ 29} Construing the evidence in the light most favorable to the State, the State offered sufficient evidence to prove that Ahmad committed conspiracy to commit murder. Ryan's testimony, if believed, established that Ahmad purposefully promoted the murder of Hornsby in order to end his acrimonious custody dispute with Hornsby and the financial difficulties that he believed were caused by her. In addition, the evidence supports the conclusion that Ahmad planned and aided in planning the commission of Hornsby's murder with Ryan, who arguably was a participant in the plan. There was evidence of several overt acts by Ahmad, including, for example, the provision of money to Ryan to hire a hit-man and the gathering and attempted delivery of the school address and photos of Hornsby for Ryan. Ahmad's conviction was not based on insufficient evidence.

{¶ 30} Ahmad further claims that his conviction was against the manifest weight of the evidence.

{¶ 31} Ahmad did not testify at trial, but he presented two witnesses – the Hartlesses – to testify about what Ryan had reported to them about Ahmad's plot. Both Mr. and Mrs. Hartless testified that Ryan reported that Ahmad had asked Ryan to find someone to plant a large amount of drugs in Hornsby's car. Mrs. Hartless stated that Ryan told her that Ahmad had given him $2,400 for landscaping and so that he could pay someone to purchase a camera, film, and gas, to spend time following Hornsby around Batavia and to take incriminating photos of her. Mrs. Hartless testified that Ryan told her one time that Ahmad had mentioned once, in a joking manner, about finding someone to kill his ex-wife; Ryan had told Mrs. Hartless that Ahmad never offered money for that. Immediately afterward, Ahmad had reportedly said, "All joking aside, can you get someone to take pictures?"

{¶ 32} Mr. Hartless testified that he spoke with Ryan after Ahmad's arrest and Ryan stated that the detectives had wanted him to wear a wire to get Ahmad to admit that he wanted to have his ex-wife killed. Mr. Hartless had told Ryan that he needed to talk with detectives and tell them that Ahmad had only brought up killing his wife the one time and that the plot was focused on drugs and taking pictures. Mr. Hartless testified that Ryan had said that he would be charged if he did not get Ahmad to admit to the murder plot. Ryan had previously told Mr. Hartless that the $2,400 he received was so Ryan could take photos of Hornsby. Mr. Hartless told Ryan that he needed a lawyer.

{¶ 33} During Ryan's cross-examination, he indicated that he had tried to talk to his

mother about the pressure he was under from Ahmad. Ryan stated that he told his mother that Ahmad's plan had "moved" from having Hornsby killed, to photos, to having somebody plant drugs on her.

**{¶ 34}** Detective Daugherty also testified that he had spoken again with Ryan on November 5, 2009. At that time, Ryan told the detective that Ahmad had been pressuring him just to get photographs of Hornsby or to plant drugs in her vehicle, not to have Hornsby killed.

**{¶ 35}** Upon review of the entire record, the jury was presented with evidence that Ahmad had originally asked Ryan, in a serious manner, to find someone to kill his ex-wife and that Ahmad was interested in pursuing Hornsby's death until his arrest. In contrast, there was also evidence that Ahmad's initial statement about killing Hornsby was made in a joking manner and that his plan was actually directed to incriminating photos and planting illegal drugs on her. As stated above, the credibility of the witnesses and the weight to be given to their testimony were matters for the jury, as the trier of fact, to determine. The jury's decision to credit the State's evidence did not create a manifest injustice. Ahmad's conviction for conspiracy to commit murder was not against the manifest weight of the evidence.

**{¶ 36}** The second and third assignments of error are overruled.

## II. Errors Regarding Written Jury Instructions

**{¶ 37}** In his first assignment of error, Ahmad claims that the trial court erred when it provided improper written instructions to the jury without trial counsel's knowledge. He asserts that there were two major errors in the written instructions: (1) the absence of an

instruction on abandonment and how the jury should proceed with deliberations after an affirmative defense is established, and (2) the misstatement that the jury must find the defendant "guilty," instead of "not guilty," if the jury finds the affirmative defense of entrapment had been proven.[1]

{¶ 38} Prior to deliberations, the trial court provided oral instructions to the jury. These instructions included statements of the law regarding the elements of conspiracy and the affirmative defenses of entrapment and abandonment. Counsel did not object to the court's oral instructions, and there are no allegations on appeal that the oral instructions contained errors.

{¶ 39} After its oral instructions, the trial court "attempted to submit written instructions to the jury that would conform to the Court's charge to the jury." Counsel was not provided an opportunity to review those written instructions. Defense counsel stated, under oath, that he was specifically informed by the court's bailiff that written instructions would not be created and would not be provided to the jury.

{¶ 40} The jury began its deliberations at 3:17 p.m. on the third day of trial. At approximately 5:10 p.m., the jury was sent home for the evening. The jury decided to return at 9:00 a.m. After returning the following morning, the jury sent a question to the court asking, "Does the jury have to [reach] an unanimous agreement of did or did not on all of the overt acts[?]" (Emphasis sic.) This question led counsel and the court to review the

---

[1] Ahmad moved for a mistrial based on the improper written jury instructions. That motion was denied. After the jury's verdict was rendered and prior to sentencing, Ahmad filed a motion for a new trial due to the erroneous written jury instructions. This motion was also denied. Although Ahmad argues on appeal that a new trial is warranted, he does not specifically challenge the trial court's denial of his post-trial motion for a new trial.

written jury instructions that were provided to the jury for their use during deliberations.

{¶ 41} In an in-court discussion at approximately 11:00 a.m., defense counsel requested a mistrial for several reasons. First, counsel objected to the fact that he was not provided an opportunity to review the written instructions before they were provided to the jury. Second, he asserted that the entrapment instruction included an erroneous statement, namely "If the defendant did not himself conceive of committing the offense, and if it was suggested to him by the officer for the purpose of causing his arrest and prosecution, the defendant must be found *guilty*." (Emphasis added.) The correct statement would be "not guilty." Third, counsel argued that the written instructions erroneously failed to list abandonment as an affirmative defense. Fourth, counsel asserted that the court erred in failing to include how the jury was to proceed during deliberations after an affirmative defense was established.

{¶ 42} After an extensive discussion, the trial court overruled the motion for a mistrial. The court reasoned that its oral instructions were a correct statement of the law. It acknowledged that the written instructions did not correctly reflect the court's oral instruction, noting a surplus paragraph regarding opinion testimony and the incorrect "guilty" in place of "not guilty" on the entrapment instruction. It concluded, however, that it could correct the written instructions while the jury was still deliberating.

{¶ 43} Shortly after noon, the court informed the jury, as follows:

* * * We've received a question from you that the Court is going to answer and your deliberations have been interrupted so that that can be answered. But the occasion of that question has caused us to review the

written jury instructions that you received after the oral instructions were given to you by the Court.

These written instructions were intended to simply reiterate the oral instructions that I had given to you, but after examining them we find that there's some typos in there and some other language that was included that really was not part of the oral instructions that I gave you. And so in order to make it clear in your mind that the oral instructions of the court are the instructions that are significant and are appropriate and that you are to follow. And I'm going to point out where the typographical errors are in the written instruction and you can make those changes and disregard – there's some surplusage language in there.

* * * I want to make sure that it's clear that I'm not attempting to emphasize one part of the instructions over any other part that you got. All of the instructions are to be considered as a whole by you and applied to your consideration of the facts in the case. And we will mark on your copy of the instructions these details.

The court instructed the jury to excise the paragraph regarding opinion testimony and told them of the "typographical error" where "not" was missing. The jury was provided a new copy of the jury instructions, with the corrections italicized and in bold print. The new copy included explicit instructions on how the jury should proceed if an affirmative defense were or were not proven.

{¶ 44} The jury returned its guilty verdict at approximately 1:15 p.m. Ahmad

renewed his motion for a mistrial, which was denied.

{¶ 45}    Crim.R. 30(A) requires the trial court to "reduce its final instructions to writing or make an audio, electronic, or other recording of those instructions, provide at least one written copy or recording of those instructions to the jury for use during deliberations, and preserve those instructions for the record."   Generally, objections to the jury instructions are waived if counsel does not object "before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection."   *Id.*

{¶ 46}    In this case, counsel was not provided a copy of the written instructions prior to the jury's deliberations and allegedly had been informed by court personnel that no written instructions would be provided.   The record reflects that defense counsel objected to the written instructions upon becoming aware of them.   Accordingly, Ahmad did not waive his challenge to the written jury instructions.

{¶ 47}    "A criminal defendant has a right to be aware of all communications with the jury, including any written jury instructions that are taken into the jury room for deliberations.   Although those written instructions may only repeat earlier oral instructions, a defendant nevertheless must be allowed to inspect the written instructions to discover any omissions or discrepancies."   *State v. Schiebel*, 55 Ohio St.3d 71, 85, 564 N.E.2d 54 (1990).  Nevertheless, the denial of the right to review the written instructions constitutes reversible error only if the defendant is prejudiced.   *Id.* at 86; *Neder v. United States*, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (errors in jury instructions are subject to harmless error analysis).

{¶ 48}    Under the particular facts of this case, we do not find that reversible error

exists due to discrepancies in the written jury instructions and the delay in discovering them. The trial court provided proper oral jury instructions, without objection. While the jury was deliberating, the court and counsel became aware of the discrepancies between the oral and written instructions. The trial court orally informed the jury of the errors in the written instructions and provided a corrected copy of the written instructions. In doing so, the court emphasized that the oral instructions were the instructions to be followed and that the instructions were to be considered as a whole, without giving undue weight to the instructions that were corrected. The jury deliberated for an additional hour after the corrections were given. We have no basis to believe that the jury was confused by the initial discrepancies between the oral and written instructions or that the jury failed to follow the court's oral instructions and the corrected written instructions. Although error existed, Ahmad has not demonstrated that the errors regarding the written jury instructions were prejudicial.

{¶ 49}  The first assignment of error is overruled.

### III.  Evidence of Defendant's Prior Conduct

{¶ 50}  Ahmad's fourth assignment of error states that the trial court erred in allowing testimony regarding his prior conduct.

{¶ 51}  Evid.R. 404(B) provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The Ohio Supreme Court recently discussed Evid.R. 404, stating:

Evid.R. 404 codifies the common law with respect to evidence of other acts of wrongdoing. The rule contemplates acts that may or may not be similar to the crime at issue. If the other act is offered for some relevant purpose other than to show character and propensity to commit crime, such as one of the purposes in the listing, the other act may be admissible. *Id*. Another consideration permitting the admission of certain other-acts evidence is whether the other acts "form part of the immediate background of the alleged act which forms the foundation of the crime charged in the indictment" and are "inextricably related" to the crime.

(Citations omitted.) *State v. Morris*, _____ Ohio St.3d _____, 2012-Ohio-2407, N.E.2d ____, ¶13.

**{¶ 52}** Trial court decisions regarding the admissibility of other crimes, wrongs, or acts under Evid.R. 404(B) are evidentiary determinations that rest within the sound discretion of the trial court. *Morris* at syllabus. We review such decisions under an abuse of discretion standard. *Id*. at ¶ 1.

**{¶ 53}** During the State's case-in-chief, Hornsby testified regarding a telephone conversation that she had with Ahmad in May 2009, during which Ahmad allegedly threatened her life. Hornsby testified:

> I was texting Tiffany Ahmad at the time. My son had come home
> and asked – he told me that his dad wants to move to Hawaii with us if we
> were to go and relocate and I said really, your dad wants to move to Hawaii?
> So I was texting Tiffany and I said, is this true? She said well, I don't really

care where I go. And so I called Shafik and I said is this true, that we can move to Hawaii and you guys would move with us? * * * [H]e said, oh no, I won't be going, you can go, [Z.] would stay here with me. And I said no, I wouldn't leave my son, so I guess we're just not going.

And then he started screaming at me in the phone and said that I will have my son, I will have my son. It was like a switch went off and I said, how are you going to do that? What are you going to do, have me killed? And [he] said I will if I have – and that's all I had and I was shaking. And I went in the house because I was in my car and I was like, God, what do I do, and I called the sheriff and I said, I don't know what to do. I don't know if he meant that or if he didn't mean it or and he advised me to make a telephone harassment [complaint].

**{¶ 54}** Defense counsel did not object to these specific statements. However, before Hornsby's testimony began, counsel asked whether the State would raise any past incidents of violence. When the prosecutor indicated he would ask Hornsby about the May 2009 threat, Ahmad's counsel asked the court to "note my objection."

**{¶ 55}** After Hornsby's testimony, the State expressed its intent to call Jason Jones, who would testify about prior interactions with Ahmad during which Ahmad allegedly tried to find someone to kill Hornsby. The court indicated that it would not allow the State to call Jones in its case-in-chief. The court later explained that it saw "too much opportunity for [an] impermissible inference, even with a limiting instruction," that Ahmad had a general propensity to commit a similar act and that he acted in conformity with his prior conduct.

The court further indicated that its ruling did not preclude the State from offering Jones's testimony in rebuttal, if the appropriate circumstances arose.

{¶ 56} Ahmad subsequently presented witnesses who stated that Ahmad never expressed to Ryan, in a serious manner, that he wanted to find someone to kill his ex-wife. The State subsequently called Jones, who testified about his prior relationship with Ahmad and his discussions with Ahmad about Hornsby and how she could be "taken out."

{¶ 57} Upon review, the trial court did not abuse its discretion in permitting Hornsby to testify about Ahmad's May 2009 threatening statements to Hornsby and in allowing Jones to testify during rebuttal about Ahmad's earlier attempts to convince Jones to kill Hornsby. None of the challenged testimony was offered to prove Ahmad's bad character and that he acted in conformity with that character. Rather, Hornsby's testimony tended to show that extent to which Ahmad wanted custody of his son and that he was willing to contemplate Hornsby's death in order to obtain custody.

{¶ 58} Jones's testimony directly refuted the Hartlesses' testimony, which was offered to show that Ahmad had only seriously considered planting drugs on Hornsby or having incriminating photos taken of her. The Hartlesses had testified that Ryan reported to them that Ahmad "jokingly" asked him, at the beginning of the scheme, about finding someone to kill his ex-wife; Mr. and Mrs. Hartless had pressured Ryan to tell detectives that the plot involved only drugs and pictures. In contrast, Jones testified that Ahmad had cultivated a friendship with him, that Ahmad complained about his ex-wife and expressed an interest in having her "taken out," that Ahmad had bargained for a price, and that Ahmad had discussed ways that Hornsby could be killed with Jones. Jones's testimony supported

Ryan's testimony that Ahmad had not been joking when he asked Ryan to find someone to kill Hornsby.

{¶ 59}   In short, Evid.R. 404(B) provides that evidence of other acts is admissible to prove a person's intent, and Ahmad's intent to cause Hornsby's death was clearly a matter in issue.   The trial court did not abuse its discretion in concluding that Hornsby's and Jones's testimony regarding Ahmad's prior conduct was admissible under Evid.R. 404(B).

{¶ 60}   The fourth assignment of error is overruled.

### IV.   Conclusion

{¶ 61}   The trial court's judgment will be affirmed.

. . . . . . . . . .

GRADY, P.J. and DONOVAN, J., concur.

Copies mailed to:

Carley J. Ingram
Jay A. Adams
Hon. John W. Kessler, Visiting Judge
Hon. Barbara P. Gorman, Administrative Judge