Filed 4/22/26  P. v. Fidler CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D087149 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. INF1500770) |
| JAMES DANIEL FIDLER III, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, James S. Hawkins, Judge.  (Retired Judge of the Riverside Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed as modified and remanded with instructions.

Arthur Martin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Charles C. Ragland, Chief Assistant Attorneys General, Collette C. Cavalier and Tami Falkenstein Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

James Daniel Fidler shot his wife, Jeanette Reyes, in the head during a purported methamphetamine-fueled hallucination. He left the firearm next to one of his four young children and drove Jeanette to the hospital, where she later died from her injuries. Relevant here, the jury found Fidler guilty of second degree murder (Pen. Code, § 187, subd. (a)) and four counts of felony child endangerment (§ 273a(a) (counts 3 through 6).

On appeal, Fidler contends the trial court prejudicially erred in omitting the definition of criminal negligence from CALCRIM No. 580, the instruction on the lesser included offense of involuntary manslaughter. We, however, conclude otherwise. Although the instructional omission was error, Fidler conceded he acted with criminal negligence on the night of the shooting. Failing to instruct the jury as to the definition of criminal negligence, therefore, was harmless beyond a reasonable doubt.

Fidler also argues the court's omission of the element of criminal negligence while instructing the jury regarding both felony and misdemeanor child endangerment necessitates reversal. Because Fidler conceded he committed the lesser included offense of misdemeanor child endangerment, which includes the element of criminal negligence, he has conceded acting with criminal negligence. Although the court improperly instructed the jury by omitting the element, we conclude the error was not prejudicial.

Finally, Fidler claims substantial evidence does not support the jury's finding that he endangered two of his children, the four-year-old who was asleep in a bedroom and the two-year-old who Fidler and Jeanette's uncle found in the family car after the shooting. The parties agree that the four-year-old, the three-year-old (who was wrapped in a blanket with the loaded firearm), and the six-month-old were at the house during the killing and when Fidler left the property to take Jeanette to the hospital. The record is

2

silent as to the two-year-old's location during the shooting but firmly establishes he was not at the house with the unattended firearm. Therefore, we disagree with Fidler's argument as to the four-year-old (count 3) but agree that his conviction as to the two-year-old under count 5 is not supported by substantial evidence.[1]

Accordingly, we strike the conviction on count 5 and affirm the judgment as modified.

I.

On May 6, 2015, Fidler returned home after consuming methamphetamine and shot Jeanette in the head. An audio recorder captured approximately 20 minutes leading up to the incident, the shooting itself, and some of the aftermath. This recording was played for the jury during trial.

Fidler called emergency services, explaining Jeanette had been shot. He also sought assistance from Jeanette's uncle, who lived down the street. Jeanette's uncle helped Fidler load Jeanette's body into the family car. Before departing for the hospital, Fidler and Jeanette's uncle discovered the two-year-old in the back of the car. Fidler "tossed" the two-year-old out the window to Jeanette's uncle and drove away. Jeanette's uncle took the two-year-old to his home, later realizing Fidler's three other children—the four-year-old, three-year-old, and six-month-old—might be unsupervised.

---

[1] Although Fidler's opening brief identifies counts 3 and 4 as the convictions allegedly unsupported by substantial evidence, his argument makes clear Fidler is actually contesting counts 3 and 5. We accordingly treat the reference to count 4 as a typographical error and address counts 3 and 5 in this opinion.

When police arrived at the home, they discovered the three-year-old and six-month-old asleep in the living room. They found a loaded revolver, which lacked a safety switch, in the blanket with the three-year-old. A third child, the four-year-old, was discovered in a nearby bedroom. There were no adults inside the residence.

After delivering Jeanette to the hospital, Fidler left. Later that evening, Fidler turned himself in to law enforcement. A blood draw conducted indicated Fidler tested positive for methamphetamine and amphetamine and negative for alcohol. At trial, a drug expert testified methamphetamine usage can cause hallucinations and paranoia.

Jeanette died from her injuries on May 10. Within the week, the People charged Fidler for his role in Jeanette's death and child endangerment.

A jury found Fidler guilty of second degree murder (§ 187(a)) and four counts of felony child endangerment (§ 273a(a)). The jury also found true that Fidler personally and intentionally discharged a firearm in the commission of the murder. The trial court sentenced Fidler to an aggregate indeterminate prison term of 40 years to life plus four concurrent four-year sentences—one for each of the felony child endangerment convictions.

II.

A.

Fidler asserts the jury did not receive proper instruction regarding the lesser included offense of involuntary manslaughter. He argues the court's failure to instruct on the mens rea requirement of involuntary manslaughter necessitates reversal. The People contend Fidler failed to preserve his argument for appeal and that, in any case, he was not prejudiced by any

4

error.  We conclude Fidler did not forfeit his challenge to an inaccurate jury instruction but agree he was not prejudiced by the error.

1.

The court and attorneys discussed jury instructions extensively. Everyone agreed it was appropriate to give CALCRIM No. 580 on the lesser included offense of manslaughter.  Their discussion regarding the instruction focused on only certain portions, like unanimity.

As relevant to the elements of involuntary manslaughter, the jury was instructed as follows:

> When a person commits an unlawful killing but does not intend to kill and does not act with conscious disregard for human life, then the crime is involuntary manslaughter.
>
> The difference between other homicide offenses and involuntary manslaughter depends on whether the person was aware of the risk to life that his actions created and consciously disregarded that risk.  An unlawful killing caused by a willful act done with full knowledge and awareness that the person is endangering the life of another, and done in conscious disregard of that risk, is murder.  An unlawful killing resulting from a willful fact committed without intent to kill and without conscious disregard of the risk to human life is involuntary manslaughter.
>
> The defendant committed involuntary manslaughter if:
>
> The defendant committed a crime;
>
> The defendant committed the crime with criminal negligence;
>
> AND
>
> The defendant's acts caused the death of another person.

5

The instruction given omitted the definition of criminal negligence included in the pattern instruction. The reason for this omission was not discussed during the parties' instruction conference. The omitted definition reads:

> *Criminal negligence* involves more than ordinary carelessness, inattention, or mistake in judgment. A person acts with criminal negligence when:
>
> 1. He or she acts in a reckless way that creates a high risk of death or great bodily injury;
>
> AND
>
> 2. A reasonable person would have known that acting in that way would create such a risk.
>
> In other words, a person acts with criminal negligence when the way he or she acts is so different from the way an ordinarily careful person would act in the same situation that his or her act amounts to disregard for human life or indifference to the consequences of that act.

(CALCRIM No. 580.) That definition is not bracketed and is not optional. (See *ibid*.)

2.

The People argue Fidler failed to object to the version of CALCRIM No. 580 given and therefore forfeited the argument he now makes. They assert the instruction was not inaccurate but simply incomplete. This, they contend, means the jury was properly instructed on the law, so Fidler's challenge was forfeitable. For support, they point to *People v. Palmer* (2005) 133 Cal.App.4th 1141, 1156, in which the court held that "if the instruction as given is adequate, the trial court is under no obligation to amplify or explain in the absence of a request that it do so." (Cleaned up.) Fidler counters that his failure to object to the "incomplete" instruction did not

6

forfeit his challenge.  He argues the court had a duty to instruct on each element of the offense and contends the duty extends to defining terms that have special legal meanings.  He further argues that, if his failure to object below could forfeit the issue for his appeal, the error affected his substantial rights and should therefore be considered.  We agree with Fidler.

Generally, an incomplete but otherwise accurate statement of the law must be challenged below to preserve an alleged instructional error for appeal.  (*Palmer,* 133 Cal.App.4th at p. 1156.)  However, we are not convinced the instruction here was an accurate statement of the law as it relates to the mental state attached to involuntary manslaughter.  (*Ibid*.)  The court has a duty to instruct on the principles of law that are necessary for a jury's understanding of the case.  (*People v. Roberge* (2003) 29 Cal.4th 979, 988.)  This includes defining a term that does not have a plain meaning or carries a technical or legal meaning.  (*Ibid*.)  "Criminal negligence" is not a phrase with a common lay meaning; it is distinct from "ordinary negligence."  (*People v. Nicolas* (2017) 8 Cal.App.5th 1165, 1174.)  Criminal negligence has its own elements, which are typically explained to jurors.  (See CALCRIM No. 580.)  While the court provided the introductory paragraphs of CALCRIM No. 580, it did not define criminal negligence, enumerate its elements, or otherwise provide guidance needed for the jury to consider Fidler's mental state as it related to involuntary manslaughter.  The instruction therefore provided a deficient statement of the applicable law.

Because the jury did not receive complete instruction on the mental state necessary to establish involuntary manslaughter, we conclude Fidler did not forfeit his challenge to the flawed version of CALCRIM No. 580 provided to the jury.  We turn, then, to the merits of his claim.

3.

As to the merits of Fidler's claim, the People assert that even if Fidler did not forfeit his claim, it fails for lack of prejudice. Because Fidler conceded he acted with criminal negligence when he shot Jeanette, we agree he was not prejudiced by the deficient jury instruction.

We generally review allegedly improper jury instructions de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) Resulting error is reviewed under either *Chapman v. California* (1967) 386 U.S. 18, 24, which requires the prosecution to show federal constitutional error was harmless beyond a reasonable doubt, or under the less strenuous standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, which requires the defendant to demonstrate the reasonable probability of a more favorable result and generally applies to state-law errors. "An instructional error involving a single element will be deemed harmless only in unusual circumstances, such as where the element was undisputed, the defense was not prevented from contesting the omitted element, and overwhelming evidence supports the omitted element." (*People v. Merritt* (2017) 2 Cal.5th 819, 828 [cleaned up].)

It is undisputed the court failed to give the entire pattern instruction on involuntary manslaughter. While the jury was instructed as to each element of involuntary manslaughter, one element—criminal negligence— was not clearly explained. Because "criminal negligence" does not have a common lay meaning, the jury could only ascertain that meaning from the instructions, which were inadequate. Absent compelling reasons, accordingly, such error should be reversible.

But we conclude this is one scenario in which such "unusual circumstances" have been established. (*Merritt*, 2 Cal.5th at p. 828.) Even under the more stringent *Chapman* standard, Fidler has failed to

8

demonstrate reversible prejudice. Defense counsel, given the opportunity to dispute the element, instead elected to concede and make the element undisputed. Defense counsel admitted Fidler "made poor decisions" and was "responsible for [Jeanette's] death," before conceding the jury could "hold him accountable *because he was criminally negligent*. You can say that with your verdict." (Italics added.)

On this record, no jury would have decided anything different had it been properly and fully instructed on criminal negligence. Accordingly, the erroneous omission regarding criminal negligence in CALCRIM No. 580 is harmless beyond a reasonable doubt.

B.

Fidler challenges the instructions regarding felony and misdemeanor child endangerment, CALCRIM Nos. 821 and 823, for their failure to include criminal negligence, an element of each offense. The People concede the instructions should have included the elements, but contend the jury did receive clarification from the prosecutor regarding what constitutes criminal negligence. We reject Fidler's assertion that the convictions he sustained under section 273a should be overturned because he again conceded he acted with criminal negligence; he therefore has failed to establish he suffered prejudice.

Child endangerment occurs when a person "willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or per person or health is endangered." (§ 273a(a).) The offense is a felony when it occurs

9

"under circumstances or conditions likely to produce great bodily harm or death." (*Ibid.*) Otherwise, the offense is a misdemeanor. (§ 273a(b).)

The jury was instructed on both felony child endangerment and the lesser included crime of misdemeanor child endangerment. Under the circumstances of this case, either theory of culpability required the jury to determine that Fidler was criminally negligent. (See *People v. Valdez* (2002) 27 Cal.4th 778, 788; CALCRIM Nos. 821, 823 [Alternative 1D].) Fidler acknowledges this in his opening brief.

As discussed above, instructions omitting an element are not necessarily fatal to a conviction for the relevant offense. (*Merritt,* 2 Cal.5th at p. 828.) Omitting an element renders an instruction inaccurate and is subject to review under *Chapman.* (*Neder v. United States* (1999) 527 U.S. 1, 17.)

Although the court did not instruct the jury on the definition of criminal negligence, the jury nevertheless received it during the prosecutor's closing argument. The prosecutor explained that, in the context of child endangerment, "[c]riminal negligence involves more than ordinary recklessness, inattention, or mistake of judgment." And the prosecutor explained, "[a] person acts with criminal negligence when [t]he[y] act[] in a reckless way that is a gross departure from the way an ordinary, careful person would act in the same situation." Following the prosecutor's closing statement, Fidler conceded his criminal negligence when he endangered his children. As to the counts of child endangerment, Fidler's counsel stated: "Counts 3, 4, 5, and 6, [Fidler]'s responsible for the situation and the circumstances of that house. He's equally responsible along with their mother . . . he's the one that has to accept responsibility for that now, *but that's the lesser included offense*. That is not a situation of death and great

10

bodily injury." More succinctly, defense counsel conceded misdemeanor child endangerment when he stated that Fidler "is only guilty of . . . child endangerment not likely to cause death or great bodily injury." Fidler contested only whether his actions were likely to cause death or great bodily injury to the children—i.e., whether he committed felony child endangerment. By conceding guilt for misdemeanor child endangerment, Fidler conceded each of the elements of the offense, including that he acted with criminal negligence.

On this record, Fidler failed to establish he was prejudiced by the error.

C.

Finally, Fidler challenges whether his convictions for felony child endangerment related to the four-year-old and two-year-old are supported by substantial evidence. The People counter that "intentionally firing a gun inside a home where children were present and leaving the loaded weapon in an easily accessible place" constituted "circumstances likely to produce great bodily harm or death." We reject Fidler's argument that the conviction as to his four-year-old was not supported by substantial evidence but conclude the record does not support his conviction as to the two-year-old.

The four-year-old, like the three-year-old and six-month-old, was asleep at home when Fidler drove Jeanette to the hospital. And, like those children, was left unattended in the home with a loaded firearm. Fidler concedes substantial evidence supports his convictions as to the three-year-old and six-month-old because he left them in the same room as a loaded firearm. Fidler attempts to distinguish the four-year-old's situation on the ground that he slept in a separate room. As to the two-year-old, Fidler similarly asserts the child was not endangered because he was not in the room with the firearm. The two-year-old was with Jeanette's uncle when Fidler drove Jeanette away.

11

"In evaluating a claim that a conviction lacks sufficient evidence, we review the whole record to determine whether there is substantial evidence to support the verdict such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Wear* (2020) 44 Cal.App.5th 1007, 1019 [cleaned up].) "In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*Ibid.* [cleaned up].) Such evidence can include not only circumstantial evidence, but also all reasonable inferences drawn from it. (*People v. Soriano* (2021) 65 Cal.App.5th 278, 286.) We "'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence,'" but we neither reweigh the evidence nor reevaluate the credibility of the witnesses. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

1.

We find it helpful to first address the question of whether the single gunshot was likely to produce great bodily harm or death to the children. The People cite *Creech v. Frauenheim* (2015) 800 F.3d 1005 for the proposition that firing the weapon inside the home feloniously endangered the children. However, in *Creech*, the defendant fired his weapon, a shotgun, *into* the home. That is, he stood outside the home "to shoot *at* and damage his house." (*Id.* at p. 1009, italics added.) The defendant testified he believed the house was empty despite signals to the contrary, used ammunition designed to create a larger field of impact, and fired multiple shells into the home. (*Id.* at pp. 1009-1010.) Other witnesses testified the defendant aimed the shotgun at them and tracked them through the windows. (*Ibid.*) *Creech*, therefore, is readily distinguished from the case before us.

12

Fidler shot a single bullet *at* his wife while they were both *inside* the home.  Nothing in the record suggests his children were in the path of the bullet, and the People concede there is no evidence the children were in the room when Jeanette was shot.  Nor is there evidence in the record to support a finding that the single shot was likely to produce great bodily harm or death to the children.  The People contend a stray bullet might have injured the children, but there was no stray bullet—Jeanette did not have an exit wound.  On this record, we thus conclude the shot that killed Jeanette was not likely to produce death or great bodily injury to any of the children.

We turn, then, to the issue of the loaded firearm being left next to a sleeping child.  Fidler concedes leaving the loaded firearm on the couch next to the three-year-old created "a risk of death and great bodily harm for [the three-year-old and six-month-old]."  We address the four-year-old and the two-year-old separately due to their varied circumstances.

2.

The four-year-old, like his three-year-old and six-month-old siblings, slept at the house following the shooting, albeit not in the same room as the loaded and unsecured firearm.  On this record, we conclude substantial evidence supports Fidler's conviction for felony child endangerment as to the four-year-old (count 3).

Failing to deny children access to a loaded firearm is sufficient to constitute circumstances likely to produce great bodily harm and death. (*People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 917.)  The four-year-old was not denied access to the loaded firearm merely by sleeping in a different room.  The four-year-old could easily have woken and gone to the living room, obtaining access to the firearm.

13

Fidler's concession that leaving the six-month-old near the firearm created a risk of death and great bodily harm to the six-month-old is also significant because the six-month-old could not access the firearm directly due to his age and confinement to the crib. Thus, Fidler implicitly acknowledges that the risk of death and great bodily harm is not limited to the child's *access* to a firearm, but rather the danger that a different child with access might use it on the child.

Indeed, during closing argument, Fidler's counsel admitted, "We have one child who is lying there, and there's a gun under the blanket. Sure, that can be a basis for child endangerment. Assuming that child could pull the trigger and discharge that firearm, that would be child endangerment likely to produce death or great bodily injury." In this way, the four-year-old and six-month-old are indistinguishable. The four-year-old was as vulnerable as the six-month-old if the three-year-old seized the weapon. A rational jury could deduce these facts from the evidence they were provided and find that Fidler's actions exposed the four-year-old to a risk of death and great bodily harm.

3.

The two-year-old, however, faced different circumstances. The record shows that the two-year-old left with Jeanette's uncle and was not present when Fidler left the firearm with the three-year-old. We therefore conclude that Fidler's conviction for felony child endangerment as to the two-year-old, count 5, is not supported by substantial evidence.

The two-year-old was in the family car when Fidler and Jeanette's uncle moved Jeanette into the car to go to the emergency room. Although in the audio recording played for the jury a child can be heard crying in the background before the gunshot, there is nothing to establish which of the four

14

children was crying or where the children were located in relation to the recording device. Nor do the cries after the gunshot, heard in the same recording, add clarity. Thus, it is unclear whether the two-year-old was one of the crying children inside the home or if the child was outside the home at the time of the shooting.

What is clear, however, is that the two-year-old was *not* present when Fidler left the loaded firearm unattended in the home. After Fidler passed the two-year-old to Jeanette's uncle and left for the hospital, Jeanette's uncle took the child to his own home. Because the two-year-old was not in the home with the loaded and unsecured firearm, he did not face the same risk as the other children.

Accordingly, we conclude the conviction for felonious child endangerment as to the two-year-old is not supported by substantial evidence and reverse as to this count.

### III.

The judgment is modified by striking the conviction on count 5 (child endangerment as to the two-year-old child), including the concurrent four-year prison term, the $40 court security fee under section 1465.8, and the $30 criminal conviction assessment under Government Code section 70373 imposed on that conviction. As so modified, we affirm the judgment.

15

On remand, the trial court shall prepare an amended abstract of judgment reflecting the modifications, which will decrease the total security fee from $200 to $160 and the total criminal conviction assessment from $150 to $120, and forward a certified copy to the Department of Corrections and Rehabilitation.

CASTILLO, J.

WE CONCUR:


DATO, Acting P. J.


BUCHANAN, J.

16